**Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**I AND J, INC., doing business as Baskin Robbins Ice Cream Franchise; and Ida and James Ruttler, Individuals, Defendants.**

No. CIV–79–885 C

United States District Court,
D. New Mexico.

May 26, 1983.

William E. Everheart, Deputy Regional Sol., Max A. Wernick, Atty., Office of the Sol., U.S. Dept. of Labor, Dallas, Tex., Ronald Ross, Asst. U.S. Atty., Albuquerque, N.M., for plaintiff.

Bruce E. Pasternack, Albuquerque, N.M., for defendants.

## MEMORANDUM OPINION

CAMPOS, District Judge.

This case was tried to the Court on April 18, 19 and 20, 1983. After careful consideration of the testimony and the exhibits ad-

duced at trial and following a review of the legal authorities which bear upon the various issues raised by the parties, the Court, pursuant to the requirements of Fed.R. Civ.P. 52, enters this Memorandum Opinion as its findings of fact and conclusions of law.

## STATEMENT OF THE CASE

This is an action brought by the Plaintiff, Raymond J. Donovan, in his capacity as the Secretary of Labor, pursuant to the provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 201–219 (hereinafter "FLSA"). The Secretary seeks to enjoin the Defendants[1] I & J, Inc., Ida Ruttler and James Ruttler from violating the minimum-wage[2] and record-keeping[3] provisions of the Act as proscribed by 29 U.S.C. §§ 215(a)(2) and 215(a)(5).[4] The Secretary also seeks to restrain the Defendants from withholding the payment of minimum wages from the date they became due, that is to require the payment of backwages.

## FACTUAL SETTING

The Defendants Ida and James Ruttler are residents of Albuquerque, New Mexico, and have been so for all of the period relevant to this controversy. The seeds for the present litigation were sown when the Ruttlers acquired the franchise to a couple of Baskin-Robbins Ice Cream stores with the aid of loans from the Small Business Administration. The Ruttlers obtained the Baskin-Robbins Store # 213 in April of 1973 and Baskin-Robbins Store # 224 on February 15, 1976 (see *Plaintiff's Exhibit 1*). Throughout this period and to the present time the Ruttlers have exercised total organizational and administrative control over the daily operation of the two stores. Together they constitute the ultimate repository of authority for the business.

On the advice of an officer of Albuquerque National Bank the Ruttlers decided to incorporate the two stores which had previously been sole proprietorships. This organizational transformation was accomplished on March 1, 1977 when ownership of the two Baskin-Robbins stores was transferred to the new corporation, I & J, Inc. in

---

**1.** 29 U.S.C. § 217 provides in pertinent part that "[t]he district courts ... shall have jurisdiction, for cause shown, to restrain violations of Section 215 of this title, including in the case of violations of Section 215(a)(2) of this title the restraint of any withholding of payment of minimum wage or overtime compensation found by the court to be due the employees under this chapter...." The Act, also in addition to the injunctive relief, permits the Secretary to "bring an action in any court of competent jurisdiction to recover the amount of the unpaid minimum wages...." 29 U.S.C. § 216(c) (Supp. IV 1980).

**2.** 29 U.S.C. § 206(a)(1) provides that "[e]very employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates:

(1) not less than $2.65 an hour during the year beginning January 1, 1978, not less than $2.90 an hour during the year beginning January 1, 1979, not less than $3.10 an hour during the year beginning January 1, 1980 and not less than $3.35 an hour after December 31, 1980, except as otherwise provided in this section."

**3.** 29 U.S.C. § 211(c) provides that "[e]very employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder." The regulations which prescribe what items the employer is to record with regard to each employee subject to minimum wage provisions are set out in 29 C.F.R. § 516.2(a)(1)–(12) (1982).

**4.** 29 U.S.C. § 215(a) provides in pertinent part that it shall be unlawful for any person "(2) to violate any of the provisions of section 206 or section 207 of this title, or any of the provisions of any regulation or order of the Administrator issued under section 214 of this title;" and "(5) to violate any of the provisions of section 211(c) of this title, or any regulation or order made or continued in effect under the provisions of section 211(d) of this title, or to make any statement, report, or record filed or kept pursuant to the provisions of such section or of any regulation or order thereunder, knowing such statement, report, or record to be false in a material respect."

exchange for stock in the corporation. Ida and James are the sole officers of the corporation and together own 100% of its stock. Although the two stores were now both owned by the corporation they retained separate franchise agreements, separate leases, vendor accounts, state tax numbers, and inventory control. In July 1978 I & J, Inc. purchased Baskin-Robbins Store # 3207 (see *Plaintiff's Exhibit 2*). This store was soon sold in March of 1979 due to the Ruttlers' inability to manage all three stores by themselves.

Ida Ruttler called the Albuquerque office of the Wage and Hour Division (hereinafter "WHD") in February 1977 prior to the March incorporation. She spoke with an unknown employee of the WHD and detailed the current state of their business and the proposed incorporation. Ida told the person from WHD that (1) she and her husband were the sole proprietors of two retail stores which were maintained as separate franchises; (2) the stores individually had gross receipts of less than $250,000,[5] but together exceeded that amount; (3) the proposed corporation would own both stores. She then asked if the incorporation would alter their present status of nonlia-bility for the payment of minimum wage. Ida was then informed by the WHD employee that the incorporation would not affect that status. This initial inquiry was prompted by her concern that the business reorganization would change wage and hour liability.

After the incorporation Ida was still apparently concerned about I & J's wage and hour liability so, in August 1977, she directed John Gabbel, their accountant, to call the Albuquerque office of WHD. Gabbel did in fact telephone the Albuquerque WHD office and explained the basic business arrangement previously outlined by Ida Ruttler. An unknown female WHD employee then informed Gabbel that given the information he had provided I & J did not have to pay a minimum wage to its employees. Ida repeated his entire sequence within a week of Gabbel's call.[6] Again, a WHD employee informed her that given the circumstances she described, I & J was exempt from the minimum wage requirements of the Act.

Business for I & J, Inc. proceeded as usual until June 14, 1978 when William Burns, a compliance officer with WHD, contacted Ida and informed her that he was

---

**5.** Evidence produced at trial provides the following financial accounting:

Individual Income Tax

| Year | Store # | Gross Receipts |
|------|---------|----------------|
| 1976 | 213 | $175,046.72 |
| 1976 | 224 | $125,903.83 |
| 1977 | 213 | $ 22,858.02* |
| 1977 | 224 | $ 20,898.48* |

Corporate Income Tax

| Year | Store # | Gross Receipts |
|------|---------|----------------|
| 1977 | 213, 224 | $331,839.00** |
| 1978 | 213, 224, 3207 | $417,919.00 |
| 1979 | 213, 224, 3207 | $390,105.00 |
| 1980 | 213, 224 | $373,496.00 |
| 1981 | 213, 224 | $378,417.00 |
| 1982 | 213, 224 | unknown at time of trial |

\* First two months prior to incorporation
\*\* Remaining ten months after incorporation

**6.** Ida Ruttler was most persistent with her inquiries directed to the WHD. She testified that on two other occasions between August 1977 and June 1978 she went to the Albuquerque WHD office and obtained wage and hour pamphlets explaining the operation and cover-age of the FLSA. Although it is disputed by WHD officials, she testified that in March 1977 she attended a seminar presentation for Baskin-Robbins' franchise owners conducted by the WHD. At the conclusion of the seminar Ida approached the WHD employee and explained I & J's situation. She was informed by the WHD employee that he would require further details before an answer could be provided. Curiously, of all the various contacts with the WHD which the Defendants testified to, this was the *only* face-to-face contact with a WHD employee prior to June 1978, and his answer to a determinative query was quite equivocal. It should be noted that the only WHD record of a seminar for Baskin-Robbins franchise owners indicates that Chris Roybal, a compliance officer, explained the coverage and exemptions of the FLSA as applicable to ice cream franchises on June 29, 1976. At that meeting, Mr. Roybal recalled informing his audience that as of January 1, 1977 the exemption provided by 29 U.S.C. § 213(a)(2) for retail stores with a volume less than $200,000.00 would no longer be available since it had been repealed by the effective date of the 1974 amendments. See discussion, infra, at 97 n. 7.

investigating I & J's Baskin-Robbins' stores for possible FLSA violations. Mr. Burns examined sales records at their accountant's office and interviewed some of I & J's employees as part of his investigation. On June 15, 1978 Mr. Burns met with the Ruttlers at their home and reviewed summaries of employee payroll records. At this time he informed the Ruttlers that it was his determination that their business had become subject to the Act as of January 1, 1977 when the 1974 amendment eliminating a dollar volume of sales exemption as per then 29 U.S.C. § 213(a)(2) became effective.[7] Mr. Burns then advised the Ruttlers that they were operating the stores in violation of the Act and, further, that their business had been liable for minimum wage since January 1, 1977. Therefore, he concluded, they owed employees, who had received a substandard wage, backwages. The Ruttlers, at this time, were told that Tony Chavez, manager of Store # 213, did not fall within the exception provided by 29 U.S.C. § 213(a)(1)[8] and, therefore, they were in violation of the record-keeping provisions of the Act with regard to Mr. Chavez. Mr. Burns also explained the operative provisions of the law and provided the Ruttlers with some WHD publications. The same day Mr. Burns met the Ruttlers again, this time with their attorney present. Essentially, the WHD's position with regard to the minimum wage and hour liability of I & J, Inc. as determined by Mr. Burns was reiterated.

On August 15, 1978, the Ruttlers and their attorney had a meeting with George Rice, then acting area director of WHD. Although there are certain aspects of this meeting on which the testimony is conflicting, the Court finds that: (1) the payment of backwages was discussed; (2) Mr. Rice was left with the impression that minimum wage and overtime compliance had not yet been achieved; (3) the attorney for the Ruttlers was given until September 29, 1978

---

7. The 1974 amendments to the FLSA, Pub.L. No. 93–259, 88 Stat. 55 (1974), provided, *inter alia,* that an exemption contained in 29 U.S.C. § 213(a)(2) would be gradually cut back and then finally eliminated on January 1, 1977. The pre-amendment text reads as follows:

> (a) The provisions of sections 206 and 207 of this title shall not apply with respect to—
> (2) any employee employed by any retail or service establishment (except an establishment or employee engaged in laundering, cleaning, or repairing clothing or fabrics or an establishment engaged in the operation of a hospital, institution, or school described in section 203(s)(4) of this title, if more than 50 per centum of such establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located, and such establishment is not in an enterprise described in section 203(s) of this title *or such establishment has an annual dollar volume of sales which is less than $250,000* (exclusive of excise taxes at the retail level which are separately stated).

29 U.S.C. § 213(a)(2) (1970). The 1974 amendments provided for the following alterations:

> (a) Effective January 1, 1975, section 13(a)(2) (relating to employees of retail and service establishments) is amended by striking out "$250,000" and inserting in lieu thereof "$225,000."
> (b) Effective January 1, 1976, such section is amended by striking out "$225,000" and inserting in lieu thereof "$200,000."

> (c) Effective January 1, 1977, such section is amended by striking out "or such establishment has an annual dollar volume of sales which is less than $200,000 (exclusive of excise taxes at the retail level which are separately stated)."

1974 amendments to the Fair Labor Standards Act, Pub.L. No. 93–259, §§ (a), (b), (c). Thus, on January 1, 1977, the dollar volume exemption for retail and service establishments was completely eliminated from the Act.

8. 29 U.S.C. § 213(a)(1) provides in pertinent part that the minimum wage provisions of 29 U.S.C. § 206 shall not apply to:

> [A]ny employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary, subject to the provisions of the Administrative Procedure Act, except that an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the number of hours in his workweek which he devotes to activities not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the workweek are devoted to such activities).

to submit a legal response to WHD for the record; (4) the Ruttlers agreed to begin paying *prospective* minimum wage and overtime *if* WHD would contact Albuquerque National Bank and the Small Business Administration on the Ruttlers' behalf. It is significant that at no time during this protracted administrative investigation did the Ruttlers make an unconditional offer to pay minimum wage and overtime, nor did they ever attempt to comply with the requirements of the law as outlined to them first by Mr. Burns on June 15, 1978.

After receiving the memorandum from the Ruttlers' attorney, *Defendants' Exhibit 13,* Mr. Rice concluded that compliance for I & J, Inc. would not be forthcoming. On October 6, 1978, a Joint Review Committee of Mr. Rice and an attorney from the solicitor's office, Mr. William Everheart, examined the file and made an administrative recommendation to submit the case to the solicitor's office for civil action. *See Defendants' Exhibit 20.* The Regional Office received the file and recommendation of Michael Ward, Area Director, which concurred with the Joint Review Committee's position, on November 14, 1978. *See Defendants' Exhibit 21.* The file was reviewed and transferred to the Regional Solicitor with a recommendation for civil action on February 12, 1979. *See Defendants' Exhibit 22.* The file was assigned to Eloise Velucci of the Regional Solicitor's Office on February 13, 1979 and was finally approved for civil action on August 23, 1979. Suit was filed in the United States District Court for the District of New Mexico on November 21, 1979.

The Defendants have raised a series of objections to the Secretary's pursuit of a remedy in this case. These defenses fall under two major sub-categories. First,

there are those defenses which suggest that the Ruttlers and I & J, Inc. are either outside the definitional ambit of those businesses covered by the FLSA or that their stores were exempt from the minimum wage and overtime provisions. Second, there are those defenses which the Defendants' claim have arisen because of the Government's conduct. The Court will examine each of these arguments in turn.

*"Enterprise" Under 29 U.S.C. § 203(r)*

The concept of an enterprise for purposes of coverage under the FLSA first appeared in the 1961 amendments which had been designed to substantially expand the coverage of the Act. *Brennan v. Arnheim & Neely, Inc.,* 410 U.S. 512, 516–17, 93 S.Ct. 1138, 1141, 35 L.Ed.2d 463 (1973); *see Hodgson v. University Club Tower, Inc.,* 466 F.2d 745, 746 (10th Cir.1972). The coverage of the Act is to be liberally construed "to apply to the furthest reaches consistent with congressional direction." *Mitchell v. Lublin McGaughy & Associates, Inc.,* 358 U.S. 207, 211, 79 S.Ct. 260, 263, 3 L.Ed.2d 243 (1959). That this is so should occasion no surprise, for "[t]he Fair Labor Standards Act was enacted to provide a minimal standard of living necessary for the health, efficiency, and general well-being of workers and to prescribe certain minimum standards for working conditions." *Brennan v. Plaza Shoe Store, Inc.,* 522 F.2d 843, 846 (8th Cir.1975). The ameliorative purpose animating this piece of New Deal legislation remains today as desirable a social goal as it did in 1938. While the facts of this particular case do not raise the sweat-shop spectre, justice demands that this Court apply the substantive and remedial portions of the Act in an even-handed manner.

The Act's definition of enterprise[9] requires an investigation into three elements

---

**9.** As used in the Act, " '[e]nterprise means the related activities performed (either through operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements...." 29

U.S.C. § 203(r). [The proviso contained in that section does not apply in this particular case.]

(s) 'Enterprise engaged in commerce or in the production of goods for commerce' means an enterprise which has employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or

which must coexist before the Defendants' business operation may be considered as a single enterprise for the purpose of aggregating the gross receipts, that is, before the Baskin-Robbins stores may be found to fall within the coverage of the Act.[10] As the Tenth Circuit has noted "[a]n enterprise exists when there are (1) related activities (2) performed through unified operation or common control (3) for a common business purpose." *Wirtz v. First National Bank and Trust Company*, 365 F.2d 641, 643 (10th Cir.1966); *see also Brennan v. Arnheim & Neely, Inc.*, 410 U.S. at 518, 93 S.Ct. at 1142; *Hodgson v. University Club Tower, Inc.*, at 746; 29 C.F.R. § 776.22a (1982).

The initial requirement is that the activities of the Baskin-Robbins stores be related. Although the Act does not define "related activities," the Tenth Circuit has utilized the language of the Senate Report on the 1961 Amendments which notes that "activities are related 'when they are the same or similar.'" *Hodgson v. University Club Tower, Inc.*, at 747 (citing S.Rep. No. 145, 87th Cong., 1st Sess., 1961 U.S.Code Cong.

& Ad.News 1620, 1660). The interpretative guidelines promulgated by the Secretary indicate that:

> In the case of an enterprise which has one or more retail or service establishments, all of the activities which are performed for the furtherance of the common business purpose of operating the retail or service establishments are "related activities." It is not material that the enterprise sells different goods or provides different services, or that it operates separate retail or service establishments ... Since the activities performed by one retail or service establishment are the "same or similar" to the activities performed by another, they are, as such, "related activities." ... Whether on the same premises or at separate locations, the activities involved in retail selling of goods or services, of any type, are related activities and they will be considered one enterprise where they are performed, through unified operation or common control, for a common business purpose.[11]

materials that have been moved in or produced for commerce by any person, and which—

(2) is an enterprise which is comprised exclusively of one or more retail or service establishments, as defined in section 213(a)(2) of this title, and whose annual gross volume of sales made or business done is not less than $250,000 (exclusive of excise taxes at the retail level which are separately stated), beginning July 1, 1978, whose annual gross volume of sales made or business done is not less than $275,000 (exclusive of excise taxes at the retail level which are separately stated), beginning July 1, 1980, whose annual gross volume of sales made or business done is not less than $325,000 (exclusive of excise taxes at the retail level which are separately stated), and after December 31, 1981, whose annual gross volume of sales made or business done is not less than $362,500 (exclusive of excise taxes at the retail level which are separately stated).

29 U.S.C. § 203(s)(2). The Act provides that a " 'retail or service establishment' " shall mean an establishment 75 per centum of whose annual dollar volume of sale of goods or services (or both) is not for resale and is recognized as retail sales or services in the particular industry.... 29 U.S.C. § 213(a)(2). *See Schoenhals v. Cockrum*, 647 F.2d 1080, 1081 (10th Cir.1981) (There, the court noted that "[t]he regulations promulgated pursuant to the Act

provide substantial guidance on the issue of what constitutes a retail establishment. They describe it as selling 'services to the general public.' 29 C.F.R. § 779.318(a). Such an establishment 'provides the general public its repair services and other services for the comfort and convenience of such public in the course of its daily living.' *Id.* An establishment does not fall within the retail concept of the Act 'if it is not ordinarily available to the general consuming public.' 29 C.F.R. § 779.319." There is no question that business in question here is a retail establishment within the contemplation of the Act.

10. Prior to trial the parties stipulated that between January 1, 1977 and August 24, 1980 the Baskin-Robbins stores had two or more employees handling or otherwise working on goods or materials which had been moved in or produced for commerce. Testimony presented at the trial established that the stipulated facts have continued until the present time.

11. The reliance upon interpretative regulations is, of course, within the sound discretion of the Court. It is equally true, however, that "the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong, especially when Congress has refused to alter the

29 C.F.R. § 779.207 (1982). In this case, the retail activities of the Baskin-Robbins stores are not merely related, they are precisely the same—the sale of ice cream and related sundries.

Moreover, the operation of the stores shared a common business purpose. It is true that "profit motive, standing alone, does not suffice to satisfy the common-business-purpose requirement." *Wirtz v. First National Bank and Trust Company*, at 644; *Wirtz v. Columbian Mutual Life Insurance Company*, 380 F.2d 903, 907 (6th Cir.1967). The cases so holding, however, are distinguishable from the facts present here. In those cases, the two or more groups of employees working in the related activities were performing dissimilar functions or the business functions which were being compared differed in some significant manner. The Baskin-Robbins stores are part of the same corporation and the operational and mercantile activities of the stores are indistinguishable.

The common ownership of the stores is also a factor to be considered. As the Fifth Circuit has noted:

[C]ommon ownership of 'related activities' carries considerable weight toward a determination that there is a 'common business purpose.' Generally, when a corporation is formed to carry out a particular business objective, all the activities in furtherance thereof which it may perform through unified operation or common control will, in economic reality, be related and for a common business purpose....

*Brennan v. Plaza Shoe Store, Inc.*, at 848, citing the Wage-Hour Administrator; *see*

*also* 29 C.F.R. § 779.213 (1982). I & J, Inc. was created to further the financial interests of the Ruttlers. The ownership and operation of the stores are integral parts of this business plan. There can be no other conclusion than the economic reality is that the stores share a common business purpose.

The final question is whether there exists unified operation *or* common control of the stores. As in the case of *Wirtz v. First National Bank and Trust Company*, management and ownership of the Baskin-Robbins stores is united. The Ruttlers have absolute managerial authority, I & J, Inc. owns the stores, and the Ruttlers exercise total control over all corporate decisions. In a case factually similar to the circumstances present here, the Fifth Circuit gave "special consideration to the fact that one family participated in the ownership of the four retail stores." *Brennan v. Plaza Shoe Store, Inc.*, at 848.

The Defendants argue that because store # 213 and store # 224 are maintained as separate franchises with separate accounts they are somehow magically transformed into independent establishments within the meaning of the Act. This argument reflects a fundamental misapprehension of the purpose behind the amendments which introduced enterprise coverage, that is, to broaden the coverage. The Defendants also misread the Act which provides in the disjunctive for either unified operation (apparently the Defendants' theory) or common control. The Court finds both to be present in this case.

administrative construction." *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969). The Tenth Circuit has cited with approval the Supreme Court's analysis of the Department of Labor's interpretations of the FSLA. " 'We consider that the rulings, interpretations and opinions of the Administrator under this Act [Fair Labor Standards], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon

the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' " *Brennan v. South Davis Community Hospital*, 538 F.2d 859, 863 n. 4 (10th Cir.1976) citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). This Court has considered the various interpretations contained in the Code of Federal Regulations as they relate to the questions of coverage and exemption in this case and finds them to be helpful and persuasive.

The separation of *certain* aspects of the daily business operation, which is in all other respects identical, is of no moment. The Court finds, in this regard, one of the interpretative guidelines particularly instructive on this point.

> [T]he definition in section 3(r) makes clear that the described activities may be performed through unified operation or common control 'in one or more corporate or other organizational units.' The Senate Report on the 1966 amendments makes the following comment with respect to this:
>
> 'Also, the operations through substantial ownership or control of a number of firms engaged in similar types of business activities constitute, in the committee's view, related activities performed through unified operation or common control within the meaning of the definition of enterprise. *The fact the firms are independently incorporated or physically separate* or under the immediate direction of local management, as in *Wirtz v. Hardin,* 16 Wage Hour Cases 722 (N.D. Ala.), is not determinative of this question. (Sen.Rept. No. 1487, 89th Congress, 2nd session, page 7.)'

29 C.F.R. § 779.215(b) (1982) (emphasis added). The Court believes that separate franchise agreements, like an independent incorporation, is insufficient to take a business out of the definition of "enterprise" when the uncontroverted evidence establishes total and complete managerial, corporate, and economic control. The Baskin-Robbins stores both prior to and after incorporation satisfy the Act's definition of enterprise. Therefore, the gross volume of sales for the two stores may be aggregated to determine the gross sales volume pursuant to 29 U.S.C. § 203(s)(2).

*Coverage Exception Under 29 U.S.C. § 203(s)*

The Defendants have been adamant in their claim that this particular business falls outside of the enterprise coverage through the operation of an exception contained in § 203(s). The sub-section provides that:

> [a]ny establishment which has as its only regular employees the owner thereof or the parent, spouse, child, or other member of the immediate family of such owner shall not be considered to be an enterprise engaged in commerce or in the production of goods for commerce or a part of such an enterprise, and the sales of such establishment shall not be included for the purpose of determining the annual gross volume of sales of any enterprise for the purpose of this subsection.[12]

This provision has been characterized as the "Mom and Pop exemption" since it appears to be directed toward the small family business. In fact, the original language of the 1961 amendment limited the exception to a business which had as its "only employees" members of the immediate family. The extremely circumscribed nature of the original exception is consistent with the overall intent behind the 1961 amendments which was to extend the coverage of the Act. The legislative history of the 1966 amendments is silent on the congressional design underlying the modification of "only employees" by inclusion of the word "regular." Therefore, this Court must determine the scope of § 203(s) in light of its amendment.

*Webster's* defines "regular" as "steady or uniform in course, practice or occurrence; not subject to unexplained or irrational variation." *Webster's Third New International Dictionary* (1971) (unabridged ed.). In addition, the Secretary has offered the following guidance:

> [t]he 1966 amendments extended the exception to include family operated establishments which only employ persons other than members of the immediate family infrequently, irregularly, and sporadically.

---

**12.** This language was originally part of a proviso to § 203(s) contained in H.R. 1258 which to a large extent became the 1961 amendments to the FLSA. The 1966 amendments reorganized § 203(s) to its present form and added the adjective "regular" before employees in the first line of this exception.

29 C.F.R. § 779.234 (1982). The issue to be resolved is, then, whether the employees of I & J, Inc. worked infrequently, irregularly or sporadically, that is was their employment sufficiently steady or uniform in practice.

The evidence is clear that individual employees worked irregularly in the sense that their hours and shifts fluctuated on a weekly basis. Such variation was not, however, either unexplained or irrational, for uncontroverted testimony discloses that employee scheduling by the Ruttlers took into account the exigencies of student life. The Defendants assert that the variations in weekly scheduling remove their employees from the Act's contemplation of regularity and yet it is clear that their employment was regular in the sense that each employee was steadily on the payroll while employed.

There is a paucity of judicial construction on the meaning which underlies the "Mom and Pop" exception. One well-reasoned district court opinion suggests that the true test is whether the "employees filled roles and functions which were an integral part of the operation of the establishment." *Donovan v. Sutherland,* 530 F.Supp. 748, 750 (E.D.Mich.1982). Stated another way, would "it have been literally impossible to carry out the business of the establishment without the assistance of these employees who worked on a part-time basis." [13] *Id.* The Court finds this analysis to be an accurate interpretation of regular employment.

The evidence is uncontroverted that but for the part-time employees, I & J, Inc. would have been unable to conduct its business. These employees were an essential and integral part of the operation. The following Table illustrates the duration of employment of 162 workers.

TABLE I

| Months Employed | Number of Employees |
| --- | --- |
| less than 6 | 118 |
| more than 6 to 11 | 31 |
| 12–17 | 5 |
| 18–23 | 4 |
| more than 24 | 4 |

Although the evidence is illustrative of a relatively rapid turnover, which is characteristic of this kind of retail trade, it does not establish the Defendants' proposition that I & J, Inc. did not utilize regular employees within the meaning of the Act. To the contrary, the evidence suggests that there was a core of individuals who were regularly employed however irregular their schedules may have been. It is, therefore, the conclusion of the Court that the "Mom and Pop" exception contained in § 203(s) is inapplicable to the facts of this case.

*Equitable Estoppel*

It is the Defendants' position that their reliance upon certain erroneous statements made to them or their agent by various employees of the WHD estops the Department from prosecuting this action. In particular, the Defendants rely upon the telephonic conversations, previously outlined, with unknown WHD employees and upon an alleged statement by Mr. Rice at the August 15, 1978 meeting to the effect that if the Defendants had not heard from the Department of Labor by January 1, 1979

13. The reason for this particular interpretation becomes clear in the court's analysis of the congressional intent.

It was not the intent of Congress to allow individuals to operate an establishment which, if able to hire people for short enough periods of time or work employees short enough hours, would not have to pay the people the same wages that someone down the street would have to pay but for the fact that family members are involved in operating the establishment in question. *Donovan v. Sutherland* at 750.

This rationale comports with the fundamental purpose behind the expansion of coverage which forms the basis of the enterprise definition contained in § 203(s). It is inconceivable that Congress, without substantial discussion, would have altered this section to curtail significantly the coverage intended by the 1961 amendments simply by including the adjective "regular." This is particularly true in light of the substantial number of student and part-time employees which participate in a broad spectrum of the retail economy. It should also be noted that the Act provides a mechanism for exempting full-time students, the very kind of employee involved in this case. *See* 29 U.S.C. § 214(b)(1)(B); 29 C.F.R. § 779.408 (1982).

then they could consider the investigation to have been resolved in their favor. The testimony was in conflict with regard to the Rice statement.

Mr. Rice recalls that he may have mentioned that date as a possible deadline for compliance, but rejects the Defendants' assertion that the matter of coverage was left open. Ida Ruttler testified that Mr. Rice said that WHD would contact the Ruttlers before January 1, 1979 to let them know whether I & J, Inc. was covered by the Act and if not contacted then they could assume that coverage did not extend to the business. After careful consideration and a review of the testimony the Court finds that Mr. Rice's version is corroborated by independent evidence. A letter written by Mr. Rice to the Defendants' counsel dated August 22, 1978 gives no indication whatsoever that there remained any doubt as to WHD's position that I & J, Inc. fell within the coverage of the Act. *See Defendants' Exhibit 12.* The letter evidences Mr. Rice's concern with the corporation's ability to pay back wages which is consistent with other testimony regarding the meeting on August 15, 1978. In addition, *Defendants' Exhibit 20* reveals that the Joint Review Commission's recommendation for civil action occurred on October 6, 1978 after the time allotted Defendants' counsel to supplement the file and to provide financial information. This is also corroborative of Mr. Rice's testimony regarding the January 1, 1979 date at issue. The Court, therefore, finds that no statement was made at the meeting of August 15, 1978 which would have led the Defendants to conclude that some communication from the WHD before January 1, 1979 was a pre-condition to the coverage of the Act. The weight of the evidence is to the contrary.[14]

The Tenth Circuit has formulated a general statement of the elements of equitable estoppel. "Estoppel arises where one party, by its words or actions, misrepresents a fact, and the other party reasonably relies upon such representations to its detriment."

United Services Automobile Association v. Royal-Globe Insurance Co., 511 F.2d 1094, 1097 (10th Cir.1975); *see also Hillyer v. Pan American Petroleum Corp.,* 348 F.2d 613, 622–23 (10th Cir.1965); *see generally* D. Dobbs, Handbook on the Law of Remedies 42–43 (1973). The doctrine of equitable estoppel, as with that of laches discussed below, is sharply curtailed when a party seeks to employ it against the United States. *See generally* Annot., 27 A.L.R.Fed. 702 (1976). The genesis of this judicial practice may be found in the sovereign immunity of the state and in the need for a government to enforce its laws even where one of its employees has disseminated erroneous information. *See Goldberg v. Weinberger,* 546 F.2d 477, 480 (2d Cir.1976) (on the latter point). The Tenth Circuit has put the matter in a nutshell—"courts invoke the doctrine of estoppel against the government with great reluctance." *United States v. Browning,* 630 F.2d 694, 702 (10th Cir.1980).

The Tenth Circuit has recently added an element to the circumstances where equitable estoppel may arise. In a suit to quiet title brought by a landowner against the United States the court held that "in addition to establishing the traditional elements of estoppel, the appellants must also show affirmative misconduct by the government or its agents. . . . " *Sweeten v. United States Department of Agriculture,* 684 F.2d 679, 682 (10th Cir.1982). In a footnote, the court outlined the traditional elements of equitable estoppel as follows:

> (1) The party to be estopped must know the facts; (2) He must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) The latter must be ignorant of the true facts; and (4) He must rely on the former's conduct to his injury.

*Id.* n. 5. Although the court's holding limited the requirement of affirmative misconduct to the particular facts of the land dispute, the court has apparently extended the requirement to other factual contexts

---

**14.** This finding of fact eliminates the possibility of the defense of equitable estoppel and renders

nugatory any claim, based on the alleged statement, under 29 U.S.C. § 259.

where estoppel against the government is alleged. *See Home Savings and Loan Association v. Nimmo,* 695 F.2d 1251, 1254 (10th Cir.1982).

Equitable estoppel against the government is a "confused area of law." *Id.* at 1255 (McKay, J., dissenting). The cases are simply not susceptible to a uniform statement of law. Justice Marshall has opined that "[t]he message of today's decision—that we will know an estoppel when we see one—provides inadequate guidance to the lower courts...." *Schweiker v. Hansen,* 450 U.S. 785, 792, 101 S.Ct. 1468, 1473, 67 L.Ed.2d 685 (1981) (*per curiam*) (Marshall, J., dissenting). In fact, the appellate courts seem to have sanctioned a case-by-case analysis. *See e.g. Immigration and Naturalization Service v. Miranda,* —— U.S. ——, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982) (*per curiam*); *Home Savings and Loan Association v. Nimmo,* 695 F.2d 1251 (10th Cir.1982).

 Although a number of courts have expressed frustration with the principle,[15] the rule remains that "the United States may not be estopped from asserting a lawful claim by the erroneous or unauthorized actions of its agents or employees, nor may the rights of the United States be waived by unauthorized agents' acts." *Atlantic Richfield Co. v. Hickel,* 432 F.2d 587, 591–92 (10th Cir.1970); *see also Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947).[16] The single exception recognized by the Tenth Circuit arises where "circumstances [justifying use of the doctrine] are those which add up to the conclusion that it does not interfere with underlying government policies or unduly undermine the correct enforcement of a particular law or regulation." *United States v. Browning,* at 702. The circum-

stances of this case, unfortunate as they may be, do not overcome the strength of the counterveiling policies which underlie the enforcement of a congressionally mandated minimum wage. To find the government estopped by the erroneous statements of an employee could substantially undercut the Department's statutory duty to enforce the provisions of the FLSA. These powerful considerations counsel against a finding of equitable estoppel in this case.[17] The Court notes that the erroneous advice given by the WHD employees involved innocent mistakes. Under these circumstances the Court cannot conclude that the actions rise to the level of affirmative misconduct which the various cases suggest is necessary to find an estoppel against the government.

*Laches*

Throughout the extended and at times stormy course of this litigation, the Defendants have sought to interpose the equitable doctrine of laches between themselves and the Plaintiffs' cause of action. In essence, the Defendants maintain that the time which elapsed between the June 15, 1978 meeting with Mr. Burns and the filing of suit on November 19, 1979 reflects a "lack of diligence [which] is wholly unexcused." *Benedict v. City of New York,* 250 U.S. 321, 328, 39 S.Ct. 476, 478, 63 L.Ed. 1005 (1919). Laches appeared as a doctrine at a time when no statute of limitations was available to bar an equitable action. D. Dobbs, *supra,* at 43. " 'Laches' is the neglect for an unreasonable period of time under circumstances permitting diligence, to do what in law should have been done." *Id.* n. 19 citing *Lake Development Enterprises v. Kojetnisky,* 410 S.W.2d 361 (Mo.App.1966). There is, however, a twist to the doctrine which is applicable to this case.

---

**15.** *See,* e.g., *McFarlin v. Federal Crop Insurance Corp.,* 438 F.2d 1237 (9th Cir.1971).

**16.** "Under the settled law, however, incorrect statements made by a government official may not serve as a basis for holding the government estopped from enforcing its regulations, even if the misinformation had led to [the Defendants'] subsequent misconduct." *United States v. Browning,* at 703.

**17.** The Defendants' reliance upon *C.F. Lytle Co. v. Clark,* 491 F.2d 834 (10th Cir.1974) is misplaced. That case was a diversity action and the court applied the Colorado law of equitable estoppel. *Id.* at 838. The case simply has no relevance for the analysis required by the law applicable to an action arising under federal law.

Federal law makes an exception to the ordinary application of laches. "If Congress explicitly puts a limit upon the time for enforcing a right which it has created, there is an end of the matter." *Holmberg v. Armbrecht,* 327 U.S. 392, 395, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946).[18] The end of the matter is simply that the doctrine of laches will not apply. As noted by the Ninth Circuit "[w]here Congress has provided a specific and relatively short statute of limitations, it can be inferred that the federally created limitation is not to be cut short." *Royal Air Properties, Inc. v. Smith,* 312 F.2d 210, 214 (9th Cir.1962); *Cf. Matter of Silver Mill Frozen Foods, Inc.,* 23 B.R. 179, 181 (Bkrtcy.W.D.Mich.1982).

■ An action for injunctive relief brought pursuant to 29 U.S.C. § 217 is governed by the statute of limitations contained in 29 U.S.C. § 255(a). *See infra* at 106. The statute specifically covers any action for unpaid minimum wages brought under the FLSA. In light of the governing authority, this Court is constrained from applying the doctrine of laches.[19]

The Defendants stake their claim to a laches' defense, in large part, on the Tenth Circuit's opinion in *Marshall v. Intermountain Electric Co., Inc.,* 614 F.2d 260 (10th Cir.1980). *Intermountain Electric* is inapposite. There the court held that laches might be applied to a particular species of case—in an action brought by the Secretary of Labor to enforce § 11(c) of the Occupational Safety and Health Act, 29 U.S.C. § 660(c)—where both public and private rights were to be vindicated. Assuming that the instant case is a kind of public rights/private rights "hybrid," it is easily distinguished. As the court noted, "OSH Act contains no explicit limitations period for actions brought under § 11(c)." *Id.* at 261. The statute of limitations contained in § 255(a) is an express congressional statement upon the timing of actions brought pursuant to the FLSA. This is determinative of the issue and the defense of laches is not available to the Defendants.

*Good Faith Defense under 29 U.S.C. § 259*

Section 10 of the Portal to Portal Act creates in limited defense for employers who fail to pay minimum wages because of a good faith reliance in conformity with certain written administrative pronouncements or practices.[20] After the June 15, 1978 meeting with Mr. Burns, the Defendants obtained a copy of a particular section

---

**18.** *Holmberg* has been read by at least one authoritative commentator to stand for the proposition that "[w]here, however, a *federal* right is being enforced, and this *sole* remedy is in equity . . . the federal court should apply its doctrine of laches unless Congress has provided a rule of limitations." 2 J. Moore, J. Lucas, H. Fink & C. Thompson, Moore's Federal Practice ¶ 3.07[3] at 3–67 (1982) (emphasis in original); *Cf.* 14 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure, § 3652 at 142–43 (1976); *Thompson v. United States,* 312 F.2d 516, 519 (10th Cir.1962).

**19.** Even if federal law permitted a result to the contrary, the facts of this particular case do not suggest the kind of delay, through a lack of diligent prosecution, which would implicate the doctrine of laches. This is especially true in light of the strong public interest at stake in the enforcement of minimum wage laws. *See Wirtz v. Jones,* 340 F.2d 901 (5th Cir.1965).

**20.** 29 U.S.C. § 259 provides in pertinent part that:

(a) [i]n any action or proceeding based on any act or omission on or after May 14, 1947, no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended . . . if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section, or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged.

(b) The agency referred to in subsection (a) of this section shall be—

(1) in the case of the Fair Labor Standards Act of 1938, as amended—the Administrator of the Wages and Hour Division of the Department of Labor.

*See also* 29 C.F.R. §§ 790.13–.19 (1982); *United States v. Stocks Lincoln-Mercury, Inc.,* 307 F.2d 266 (10th Cir.1962).

of the Wage Hour Field Operation Handbook (FOH) which provided that:

(a) [t]he procedure set forth in this Sec [sic] shall be followed where violations are established which have clearly resulted from either:

(1) the employer's adherence to advice or an opinion given to him by an employee of WHPC [wage hour/public contracts] or an employee of the Solicitor; Where an employee is paid in violation under these special circumstances, the CO [compliance officer] shall request payment of the BW [back wages] involved. If the employer raises the special circumstances as a reason for not paying the BW, his refusal will be accepted and the CO shall not press the issue with respect to the employees involved in the special circumstances. The employer shall be advised, however, of his liability under FLSA Sec 16 and/or under the PCA or SCA. The number of employees involved and amounts due shall be shown on Form WH–51 and the narrative shall contain a concise statement of the facts.

(b) If the AD [area director] agrees, further negotiations shall not be undertaken and closed file shall be transmitted to the RD/DD [regional director/district director] with the notation on Form WH–136: "Violations, WHPC/SOL advice or error."

FOH § 53(a)02. The Defendants maintain that they relied in good faith upon and in conformity with this section of the FOH and that, therefore, the operation of § 259(a) bars the Secretary from bringing this enforcement action.

■ It has been held that an administrative regulation contained in the FOH may provide the basis for a § 259(a) estoppel. *Marshall v. Baptist Hospital, Inc.,* 668 F.2d 234, 238 (6th Cir.1981); but *Cf. Brennan v. Ace Hardware Corp.,* 495 F.2d 368, 376 (8th Cir.1974). In this case, however, the Defendants' knowledge of the FOH guideline comes too late to avail them of the defense.

Section 259(a) requires that the employer's act or omission must be in conformity with the particular regulation. It is clear that the Defendants could not have relied upon the FOH section prior to their knowledge of its existence. Moreover, their cognizance of § 53(a)02 occurred *after* the June 15, 1978 meeting at which Mr. Burns correctly informed them of I & J's liability for the payment of minimum wage. It is clear that § 53(a)02 contemplates that the particular advice or opinion be erroneous. The special circumstances alluded to in the section must be erroneous information, for otherwise the provision which prevents the WHD from seeking relief against a noncomplying employer makes little sense. This being the case, there is no possibility that the Defendants' act or omission could be in conformity with § 53(a)02 since the opinion of Mr. Burns was not erroneous.

In addition, § 53(a)02(1)(b) gives the area director the discretion whether to stop negotiations and to close the file. In August 1978 Mr. Rice, then acting area director, reviewed the case with the Defendants and was made aware of the FOH section. His subsequent conduct, assuming *arguendo* that there could be any application of § 53(a)02 to the case, indicates that his judgment as acting area director was to proceed with the enforcement action. Under the facts of this case, the Court cannot conclude that this decision constitutes to an abuse of discretion. In any case, after the June meeting with Mr. Burns the Defendants simply could not rely on that particular internal agency regulation. The good faith defense of § 259(a) is not available to these Defendants.

*Statute of Limitations*

The statute of limitations which controls an action brought to enforce the minimum wage provision of the FLSA is contained in the Portal to Portal Act.

Any action commenced on or after May 14, 1947, to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act—

(a) if the cause of action accrues on or after May 14, 1947—may be commenced

within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued. . . .

29 U.S.C. § 255(a). The issue is whether to apply the two or three year period which in turn requires an inquiry into the willfulness of the violation.[21]

The leading federal case on the meaning of "willful" comes from the Fifth Circuit. Judge Wisdom, speaking for the panel, held that:

> [an] employer's decision to change his employees' rate of pay in violation of FLSA is 'wilful' when, as in this case, there is substantial evidence to support a finding that the employer knew *or suspected* that his actions might violate the FLSA. Stated most simply, we think the test should be: Did the employer know the FLSA was in the picture? (emphasis added).

*Coleman v. Jiffy June Farms, Inc.,* 458 F.2d 1139, 1142 (5th Cir.1971). *See also Laffey v. Northwest Airlines,* 567 F.2d 429 (D.C. Cir.1976). The Tenth Circuit has employed the *Jiffy June* test for willfulness in the context of a violation of the Age Discrimination in Employment Act which is enforced through the FLSA. *See Mistretta v. Sandia Corp.,* 639 F.2d 588, 595 (10th Cir. 1980). In a very recent case the Tenth Circuit has amplified its holding by a construction of 29 U.S.C. § 255(a) which borrows its language from the Ninth Circuit.

> 'A violation is willful when the employer was, or should have been, cognizant of an appreciable possibility that the employees involved were covered by the statutory provisions.' *Marshall v. Union Pacific Motor Freight Co.,* 650 F.2d 1085, 1092 (9th Cir.1981); *accord, Orzel v. City of Wauwatosa Fire Department,* 697 F.2d

743, 758 (7th Cir.1983); *Mistretta v. Sandia Corp.,* 639 F.2d 588, 595 (10th Cir. 1980); *Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429, 461–62 (D.C.Cir.1976), *cert. denied,* 434 U.S. 1086 [98 S.Ct. 1281, 55 L.Ed.2d 792] (1978); *Brennan v. Heard,* 491 F.2d 1, 3 (5th Cir.1974).

*Equal Employment Opportunity Commission v. Central Kansas Medical Center,* 705 F.2d 1270, 1274 (10th Cir.1983). Although the court did not cite the remainder of the "test" it is worth noting because of the particular facts of this case. The Ninth Circuit continued: "Reliance on erroneous advice is no bar to a finding of a 'willful' violation except for good faith reliance upon advice rendered by an appropriate government agency." *Marshall v. Union Pacific Motor Freight Co.,* 650 F.2d 1085, 1092–93 (9th Cir.1981); *But see Donovan v. Sabine Irrigation Co., Inc.,* 695 F.2d 190, 196 (5th Cir.1983). This is a salutory construction of the law, one in which the employer may not escape liability for his or her own error, but which offers some measure of fairness to the individual who in good faith relies upon the judgment of a government agency with the appropriate expertise.

The repeated attempts by the Ruttlers to determine wage and hour liability for their business leads to a conclusion that they suspected or appreciated the potential coverage of the Act, but it also indicates that they cannot be accused of "an ostrich-like cultivation of ignorance." *Brennan v. Heard,* 491 F.2d 1, 3 (5th Cir.1974). The Ruttlers' reliance upon the information which they obtained from WHD employees until the meeting with Mr. Burns is sufficient evidence to this Court that the violations prior to that date do not meet the standard for willfulness. Thus, the operative statute of limitations in this case is two years from the filing of the lawsuit on November 21, 1979. The two years relates back to November 21, 1977, a time when the Defendants were not in willful violation of the Act.

---

**21.** The time for the statute of limitations begins to accrue at the time the individuals were employed and denied a minimum wage. *Cf. Unexcelled Chemical Corp. v. United States,* 345

U.S. 59, 66, 73 S.Ct. 580, 584, 97 L.Ed. 821 (1953). It is at that point when the statutory duty is breached.

*Record-keeping—Violation of 29 U.S.C. § 211(c)*

The Act requires an employer to keep certain records for every employee covered by the minimum wage provisions. See n. 3, *supra* at 95. The only alleged record-keeping violation involves Tony Chavez who was the manager of Store # 213 for a period of time. Mr. Chavez was a full-time student who received as compensation for his duties $575.00 per month. In addition, he received $25.00 per month for transportation expenses, various bonuses, and, on occasion, jewelry. The Defendants maintain that Mr. Chavez is an exempt employee under the provision of 29 U.S.C. § 213(a)(1).[22] Thus, the issue becomes whether Mr. Chavez falls within the definition of a bona fide executive.

■ The remedial purpose of the Act requires that exemption provisions are to be narrowly construed while the coverage of the Act is to receive a broad construction. *Brennan v. Yellowstone Park Lines, Inc.*, 478 F.2d 285, 288–89 (10th Cir.1973). In addition, "[o]ne asserting that an employee is exempt from the provisions of the Act has the burden of establishing the exemption affirmatively and clearly." *Legg v. Rock Products Manufacturing Corp.*, 309 F.2d 172, 174 (10th Cir.1962). The Tenth Circuit has utilized the regulatory guideline delimiting the parameters of the executive exemption. *Id.*

The regulations provide that:

The term "employee employed in a bona fide executive * * * capacity" in section 13(a)(1) of the act shall mean any employee:

(a) Whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department of subdivision thereof; and

(b) Who customarily and regularly directs the work of two or more other employees therein; and

(c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

(d) Who customarily and regularly exercises discretionary powers; and

(e) Who does not devote more than 20 percent, or, in the case of an employee of a retail or service establishment who does not devote as much as 40 percent, of his hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (d) of this section: *Provided,* That this paragraph shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment, or who owns at least a 20-percent interest in the enterprise in which he is employed; and

(f) Who is compensated for his services on a salary basis at a rate of not less than $155 per week (or $130 per week, if employed by other than the Federal Government in Puerto Rico, the Virgin Islands, or American Samoa), exclusive of board, lodging, or other facilities: *Provided,* That an employee who is compensated on a salary basis at a rate of not less than $250 per week (or $200 per week, if employed by other than the Federal Government in Puerto Rico, the Virgin Islands or American Samoa), exclusive of board, lodging, or other facilities, and whose primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein, shall be deemed to meet all the requirements of this section.

29 C.F.R. § 541.1 (1982). The threshold determination apparent in the regulation is

---

22. 29 U.S.C. § 213(a)(1) provides in pertinent part that "[t]he provision of section 206 . . . and section 207 of this title shall not apply with respect to—any employee employed in a bona fide executive [capacity].

based on salary level. *See Donovan v. Burger King Corp.*, 675 F.2d 516, 520 (2d Cir.1982). If the employee earns less than $250 per week then the employer must satisfy the so-called "long test," that is, the employer must establish that the employer meets the criteria of 29 C.F.R. §§ 541.1(a)–(f) in order to qualify the employee for an executive exemption. *Id.* at 518. This the Defendants cannot do.

The evidence is uncontroverted that Mr. Chavez was paid $575.00 per month which is manifestly less than basic salary rate of $155.00 per week required by 29 C.F.R. § 541.1(f). The established salary rate is "exclusive of board, lodging or *other facilities*" and so the various bonuses, transportation allotment, and jewelry may not be included within the wage rate calculus.[23] One of the fundamental reasons for the original enactment of the FLSA provides the explanation for the focus upon the salary rate—"to insure laboring men and women a fair day's *wage* for a fair day's work." *Shultz v. Adair's Cafeterias, Inc.*, 420 F.2d 390, 393 (10th Cir.1969) (emphasis added). The Court, therefore, concludes that for the period during which Mr. Chavez received a salary of less than $155.00 per week the Defendants were in violation of the Act's record-keeping requirements.

*Wage Credit under 29 U.S.C. § 203(m)*

The Act defines "wage" to "[include] the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees. . . ." 29 U.S.C.

§ 203(m). The Ruttlers permitted each employee, upon the completion of his or her shift, to choose up to one dollar's worth, *retail cost,* of merchandise for a "treat." The Defendants now maintain that this "treat" constitutes a wage credit within the contemplation of § 203(m). Assuming *arguendo* that an ice cream treat would qualify as another facility, the argument, nevertheless, is untenable.

There are at least two fatal defects in the Defendant's position. First, the regulations promulgated by the Secretary define the "reasonable cost" as found in the section as "the actual cost to the employer." 29 C.F.R. § 531.3(a) (1982). *See Donovan v. Williams Chemical Co., Inc.*, 682 F.2d 185, 189 (8th Cir.1982); *Lopez v. Rodriguez*, 668 F.2d 1376, 1381 (D.C.Cir.1981). Further, the employer has the burden of proving reasonable cost of the other facilities. "The facts relevant to the actual cost to the employee of the facilities are peculiarly in the employer's knowledge." *Id.* at 190. Here, the employer has established affirmatively that the "reasonable cost" was the retail price. This alone is sufficient to warrant the exclusion of the "treat" from the ambit of § 203(m).

An employer seeking a § 203(m) wage deduction has "the obligation, under the regulations, to keep records concerning the costs." *Id.; 29 C.F.R. § 516.27 (1982).[24] This requirement is not onerous and serves the important function of insuring that employers do not overcharge their employees. *Cf. Davis Brothers, Inc. v. Marshall*, 522 F.Supp. 628, 629, 631 (N.D.Ga.1981). The trial of the present case revealed that no

---

**23.** It is, in fact, quite questionable whether the jewelry would fall under the definition of "other facilities" even if the Court was to consider the matter. *See* 29 C.F.R. § 531.32 (1982).

**24.** 29 C.F.R. § 516.27 provides in pertinent part that "(a) [i]n addition to keeping other records required by the regulations in this part, an employer who makes deductions from the wages of his employees for 'board, lodging, or other facilities' (as these terms are used in sec. 3(m) of the Act) furnished to them by the employer or by an affiliated person, or who furnishes such 'board, lodging, or other facili-

ties' to his employees as an addition to wages, shall maintain and preserve records substantiating the cost of furnishing each class of facility except as noted in paragraph (c) of this section. [Not applicable in this case.] Separate records of the cost of each item furnished to an employee need not be kept. The requirements may be met by keeping combined records of the costs incurred in furnishing each class of facility, such as housing, fuel, or merchandise furnished through a company store or commissary."

records whatever were maintained, and indeed it was far from clear whether the Ruttlers had personal knowledge that each employee took a "treat" after every shift. Therefore, the Defendants may not claim a wage deduction under 29 U.S.C. § 203(m).

IT IS, THEREFORE, ORDERED that the Plaintiff prepare for and submit to this Court proposed order in conformity with this Opinion approved as to form by counsel for Defendants.