**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

v.

**WESTINGHOUSE ELECTRIC CORPORATION.**

**Civ. A. Nos. 83–5457, 84–4799.**

United States District Court,
E.D. Pennsylvania.

March 26, 1986.

Spencer H. Lewis, Jr., Issie L. Jenkins, Lanier Williams, James Garrett, Ida Chen, Philadelphia Dist. Office of EEOC, Philadelphia, Pa., for plaintiff EEOC.

Thomas L. Morrissey, Rosemary Alito, Kevin P. Duffy, Silvio J. DeCarli, Carpenter, Bennett & Morrissey, Newark, N.J., Dona S. Kahn, Harris & Kahn, Philadelphia, Pa., for defendant Westinghouse.

## MEMORANDUM

KATZ, District Judge.

In the trial of this case, I saw the human wreckage of older Westinghouse employees, let go after years of service to the Company. Because these employees were eligible for their retirement benefits, they were denied the severance pay to which younger workers were entitled. Those persons eligible for early retirement were also denied severance pay, and had to draw down their reduced pension benefits to survive.

This heartless corporate policy was justified by a variety of litigation ploys. These ranged from a belatedly invented corporate "policy" of providing a single income stream to laid off employees, to a claim that the EEOC provided insufficient conciliation efforts, to a farfetched estoppel defense that Westinghouse had relied on the flawed arguments of government lawyers in earlier litigation of this issue which it lost.

I find that Westinghouse's practice of denying severance pay to its older employees eligible for pensions is blatant, willful age discrimination.[1] I therefore enjoin the practice and award double damages to the injured employees.

I also reject the EEOC's shotgun approach of attacking a variety of other Westinghouse employment practices which are protected by law as bona fide pension and seniority arrangements. Therefore, I uphold the Westinghouse practices, other than denial of severance pay, at issue in this case.

This case began on November 10, 1982, with an administrative charge filed with the EEOC by Charles Slackway. *See* Plaintiff's Exhibit 1A. Processing of Slackway's charge culminated on June 7, 1983, with a letter of violation addressed to Westinghouse. *See* Plaintiff's Exhibit 4B. The EEOC tried to conciliate the matter. These efforts proved fruitless, and a complaint was filed in this court in November, 1983. The complaint alleged: "[s]ince before June 1, 1980, and continuously up until the present time, Defendant has willfully engaged in unlawful employment practices at its Lester, Pennsylvania facility...." The complaint targeted defendant's "failure to provide Layoff and Income Bene-

---

1. The Age Discrimination in Employment Act ("ADEA"), codified at 29 U.S.C.A. §§ 621–634 (West 1985), "broadly prohibits arbitrary discrimination in the workplace based on age." *Lorillard v. Pons*, 434 U.S. 575, 577, 98 S.Ct. 866, 868, 55 L.Ed.2d 40 (1978). The Act makes it "unlawful for an employer to ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age ... [or] classify his employees in any way which would ... adversely affect his status as an employee, because of such individual's age...." 29 U.S.C.A. § 623.

fits" to thirty-five named individuals and "all other terminated or laid-off employees aged 60 and older who were eligible for early retirement benefits and/or received early retirement benefits."

Continued investigation of Slackway's case led to further charges against Westinghouse. Once again, conciliation was unsuccessfully attempted. In August, 1984, the Commission filed an amended complaint that expanded the case by including defendant's Concordville, Pennsylvania facility and increasing the number of plaintiffs to 117. It named the following ADEA violations:

1) denying layoff income benefits (LIB) to employees laid off prior to July, 1982, who were eligible for any type of retirement;

2) after July, 1982, giving laid off employees the option of selecting either LIB or retirement, but not both;

3) forcing laid off employees to retire prior to age 70 because LIB was not available;

4) denying early retirement to laid off employees who chose LIB;

5) denying recall to work to employees who were laid off and forced to retire; and

6) giving lower retirement benefits to laid off employees who were not eligible for retirement because of age at the time of their layoff, but who later became qualified for retirement benefits.

Plaintiffs subsequently filed a second amended complaint in October, 1984. This complaint expanded the scope of the case to a nationwide complaint embracing all of defendant's employees aged 40 or older, at all of its facilities.[2]

The EEOC's charges implicate eight of defendant's employment plans and practices. The eight challenged practices are: (1) pre-July, 1982, arrangements for pensions and layoff income benefits, (2) post-July, 1982, arrangements for pensions and layoff income benefits, (3) arrangements for

management employees, (4) Advanced Retirement Plan I, (5) Advanced Retirement Plan II, (6) an "impact number" process of awarding special benefits to certain employees laid off as a result of location shutdowns, product line relocations, or job movements, (7) limitation of retirement benefits to those actually eligible at time of layoff, and (8) limitation of death prior to retirement benefits to spouses of employees actually eligible for the benefits at the time of death. Before I examine the issues surrounding these plans and practices, it is necessary to set forth their pertinent terms.

*The Pre-July, 1982, Arrangements For Pensions and Layoff Income Benefits*

Prior to July, 1982, Westinghouse employees were covered by a 1979 pension plan for represented employees, and a 1979 pension plan for non-represented employees. The pertinent characteristics of the plans were identical.

1. The plans encompassed four retirement categories. Thus, employees could take a "normal," "deferred," "early," or "selected" retirement. *See* Joint Ex. 2 at 7, 47–50.

2. Employees were eligible for normal retirement at age 65. Normal retirees were entitled to a nonforfeitable pension if they were employed by Westinghouse on the day before their 65th birthdays and had begun this employment at some time preceding the first day of the month following their 60th birthdays. *See* Joint Ex. 2 at 47.

3. Employees could defer retirement. Retirements could not be deferred beyond the first day of the month following attainment of age 70. *See* Joint Ex. 2 at 47.

4. There were four early retirement possibilities. These were:

a. If an employee was age 60 or older and had 10 or more years of service, then he or she could take an early retirement. *See* Joint Ex. 2 at 47.

**2.** At the time that the EEOC filed its second amended complaint, it also filed a new collateral complaint comprised of the same nation-

wide allegations. The two matters were consolidated.

b. If an employee was laid off at age 59, and had between 10 and 30 years of service, then the employee could retire after his or her 60th birthday, provided he or she had not been re-employed by Westinghouse. The employee was not eligible for early retirement benefits if he or she received a lump sum, related to length of service, because of the layoff or separation. In other words, the employee could not take LIB. *See* Joint Ex. 2 at 48.

c. If an employee was laid off before age 60, due to a location closedown, and was either age 55 with 10 or more years service, or age 50 with 25 or more years of service, then he or she could take an early retirement. The employee was not eligible for early retirement benefits if he or she received LIB. Employees with contractual rights at another Westinghouse location, and employees offered employment at another Westinghouse location, were not eligible for early retirement. *See* Joint Ex. 2 at 48.

d. If an employee between ages 50 and 60 with 25 or more years of service was laid off due to a job movement or product line relocation, then the employee could apply for early retirement. The employee was not eligible for early retirement if he or she received LIB. *See* Joint Ex. 2 at 48–49.

5. Selected retirement occurred in one of two situations. These were:

a. If an employee had 30 or more years of service then he or she could choose to retire after his or her 58th birthday. *See* Joint Ex. 2 at 49.

b. If an employee between ages 50 and 60 with 30 or more years of service was laid off due to a location closedown or a product line relocation, then he or she could take a selected retirement. The employee was not eligible for selected retirement if he or she received LIB. *See* Joint Ex. 2 at 49–50.

6. Layoff Income and Benefits ("LIB"), was provided to employees with at least two years of service who were laid off through no fault of their own. At mini-

mum, these employees received LIB in an amount equal to four weeks' pay. Employees' Total Maximum Sums of LIB were equivalent to one week's pay for each full year of service. *See* Joint Ex. 13 at 2–3.

7. LIB was provided in several different forms.

a. When layoffs were projected to continue for more than six months, employees could elect to receive the total amount due in one lump sum. This election terminated the employee's relationship with the Company. Thus, the employee lost all recall rights and credits for years of service, other than any rights existing under the pension plan. *See* Joint Ex. 13 at 3.

b. If an employee wished to retain recall rights and service credits, he or she could elect LIB in the form of weekly payments. Under this arrangement, Westinghouse supplemented weekly federal and state unemployment benefits so that the combined benefits equalled 60% of the employee's weekly pay. Receipt of the weekly company contributions was contingent upon receipt of each week's federal and state unemployment benefits. *See id.* at 4. When federal and state benefits expired, weekly company benefits equal to 60% of the employee's weekly pay continued either until the total maximum sum had been paid out, or until twelve months had passed since the date of layoff. *See id.* at 4.

If an employee was 59 years old and had ten years of service at the time of layoff, the LIB payments ceased when the employee turned sixty and became eligible for early retirement. *See id.* at 4.

If an employee was laid off for a year and had not been offered reemployment with Westinghouse, then weekly payments ceased and the employee received the balance of the total maximum sum in a lump sum. If, however, the employee was laid off within one year of eligibility for early retirement, then the employee received his or her early retirement pension at age 60. *Id.* at 4.

8. Employees were not eligible for LIB if they were eligible for early or selected retirement pension benefits. *See id.* at 2.

*The Post-July, 1982, Arrangements For Pensions And Layoff Income Benefits*

In July, 1982, Westinghouse implemented certain changes in its pension benefits and LIB programs. The resulting plans apply to all employees.

9. Eligibility for normal retirement continues to accrue at age 65. As before, the retiring employee is entitled to a non-forfeitable pension if he or she was employed by Westinghouse on the day before his or her 65th birthday and had begun such employment before age 60. *See* Joint Ex. 3 at 36.

10. Employees can defer retirement. Retirements may not be deferred beyond the first day of the month following attainment of age 70. *Id.*

11. There are four possibilities for early retirement.

a. If an employee has ten or more years of service, then he or she can take early retirement after turning 60. If the employee is laid off and elects to receive LIB benefits, then he or she is only entitled to vested pension benefits rather than full early retirement benefits. *See id.* at 36–37.

b. If an employee is laid off after turning 59 but before age 60 and has between ten and thirty years of service, then he or she can retire after turning 60. The employee cannot take early retirement if he or she has returned to employment with Westinghouse before turning 60. If the employee elects to receive LIB, then the employee is not eligible for full early retirement benefits. *See id.* at 37.

c. If an employee is laid off before age 60, due to a location shutdown, then the employee can take an early retirement if he or she meets one of the following age and years of service requirements:

1. Age 55 with 10 or more years of service.

2. Age 54 with 13 or more years of service.

3. Age 53 with 16 or more years of service.

4. Age 52 with 19 or more years of service.

5. Age 51 with 22 or more years of service.

6. Age 50 with 25 or more years of service.

Employees with contractual employment rights at another Company location, and employees offered employment at another Westinghouse Location, are not eligible for early retirement. If an employee elects to receive LIB, then the employee is not eligible for early retirement. *Id.* at 37–38.

d. If an employee between ages 50 and 60, with 25 or more years of service, is laid off due to job movement or product line relocation, then the employee can apply for early retirement. If the employee elects to receive LIB, then he or she cannot receive early retirement benefits. *Id.* at 38.

12. Selected retirement can occur in two situations.

a. If an employee has 30 or more years of service, then he or she can retire between ages 58 and 65. If an employee is laid off and elects to receive LIB, then the employee is not eligible for selected retirement benefits. *Id.* at 38–39.

b. If an employee between ages 50 and 60, with 30 or more years of service, is laid off due to location closedown, job movement, or product line relocation, then he or she can apply for selected retirement. Employees with contractual employment rights at another company location, and employees offered employment at another Westinghouse location, are not eligible for early retirement. If the employee elects to receive LIB, then the employee is not eligible for selected retirement benefits. *Id.* at 39.

13. The post-July, 1982, Employee Security and Protection Plan fulfills essentially the same purposes as the pre-July, 1982, Layoff Income and Benefits Plan. Thus, it provides income protection to employees

who are laid off due to a location shutdown, job movement, product line relocation, or other reasons associated with the business rather than the employee's fault. *See* Joint Ex. 14 at 1. The plan provides LIB under essentially the same terms as the pre-July, 1982, plan. *See id.* at 2, 2–6; *see also supra* paragraph 7 (describing the pre-July, 1982, LIB arrangements). The plan also encompasses Westinghouse's "impact number" process for awarding enhanced benefits for layoffs due to job movements, or product line relocations. *See* Joint Ex. 14 at 4–5; *see also infra* paragraphs 30–31 (describing impact number process).

14. If an employee is laid off after turning 59 and has 10 years of service, then he or she can elect to retire at age 60. If the employee makes this election, then he or she receives LIB until turning 60 or until the total maximum sum is paid, whichever is first. *Id.* at 7.

### Westinghouse's Arrangements For Management Personnel

15. There are three components to Westinghouse's arrangements for its managerial employees. These are: a management separation allowance program ("MSA"), *see* Joint Ex. 20, a pre-retirement income plan ("PRIP"), *see id.*, and an executive pension plan, *see* Joint Ex. 4.

16. MSA benefits are similar to LIB benefits. MSA provides a total dollar sum in an amount related to years of service and level of salary at the time of separation. This sum is payable on a monthly or lump sum basis. *See* Joint Ex. 20.

17. If an employee desires MSA in a lump sum, then he or she must specifically request that form of payment. If the employee makes this election, then he or she forfeits life insurance benefits. *Id.* at 9–10. Under the monthly payment scheme, life insurance benefits, hospital expense and surgical operation insurance, maternity benefits, and major medical protection benefits continue with MSA payments or for 12 months, whichever period is shorter.

*Id.* at 9. All other insurance benefits terminate on the last day worked. *Id.* at 10.

18. If an employee is laid off but is subsequently reemployed by Westinghouse, then he or she can keep all monthly payments received up to that time; however, lump sum payments in excess of the amount that would have been received in the monthly payments must be repaid. *Id.* at 11.

19. Prior to September, 1985, MSA benefits were not available to management employees who were eligible for an early or selected retirement pension either at the time of separation or at age 60. *Id.* at 7. Such employees may now select either MSA or pension benefits; however, they may not receive both. *See* T. Sept. 6 at 119–21.

20. PRIP provides lifelong monthly supplements to early or selected retirement pension benefits. *Id.* at 19.

21. PRIP benefit levels are determined by the reason for the employee's separation, and the employee's age and length of service. *Id.*

22. A management employee aged 59 but not yet 60, with between 10 and 30 years of service, receives monthly PRIP payments equivalent to the early retirement pension and PRIP supplement which he or she will receive at age 60. *Id.* In other words, such employees are treated as if they already are age 60, except that all money received is in the form of PRIP rather than allocated between pension benefits and PRIP. In order to qualify for such treatment, the reason for separation must be other than a location shutdown. *Id.* at 20.

23. Westinghouse also has an executive pension plan for its managerial employees. *See* Joint Ex. 4.

### Advanced Retirement Plans I & II

24. Westinghouse operated two advanced retirement programs during the time period in question. These plans are known respectively as ARP I and ARP II.

25. ARP I was in effect from June 1, 1982, through November 1, 1982. It pro-

vided certain benefits to employees who voluntarily chose to advance their date of retirement from locations with announced or contemplated reductions in force. *See* Joint Ex. 5 at 1. These benefits stemmed from pension plan improvements scheduled to take effect after the employees' chosen retirement dates. Thus, ARP I removed incentives to delay retirement by making improved benefits available to employees who would not have received such benefits without delaying retirement. The purpose of the program was to eliminate the need to separate less senior employees by encouraging attrition through voluntary retirement. *See id.* Thus, the number of ARP I participants was to correspond to the number of employees who would otherwise be subject to the reduction in force. Similarly, the program was restricted to employee categories affected by the reduction in force. *Id.*

26. ARP I participants had to be eligible for retirement at some time between June 1, 1982, and November 1, 1982. Thus, they had to be age 58 with 30 or more years of service, or age 60 with 10 or more years of service, during the relevant time period. *Id.* at 2.

27. The ARP I pension plan improvements were effective on August 1, 1982. Employees who were eligible to retire before that date could elect to retire, and were furloughed until August 1. They received any supplement that was necessary to make unemployment compensation payments equivalent to pension plan benefits in effect at the time of furlough. *Id.* at 1. On August 1, these employees retired and commenced receiving their improved pension benefits. *Id.*

Employees who were eligible to retire after August 1 could elect to retire on that date or, upon becoming eligible to retire, on the first day of any subsequent month up to November 1, 1982. Upon retirement, they received pension benefits under the improved plan. *Id.* at 1–2.

28. ARP II was similar in operation and purpose to ARP I. It was in effect between March 1, 1983, and September 1, 1983. *See* Joint Ex. 7. Like ARP I, it applied to locations and employee categories with announced reductions in force. *Id.* Participants had to be eligible for retirement at some time between March 1, 1983, and September 1, 1983. Thus, they had to be age 58 or 59 with 30 or more years of service, or age 60 or older with 10 or more years of service. *See* Joint Ex. 8.

29. ARP II pension plan improvements were effective on January 1, 1984. *See* Joint Ex. 7. ARP II participants were furloughed until that date. While on furlough, they received any payments necessary to bring their unemployment compensation up to 60% of their pay. *See* Joint Ex. 8. On January 1, their retirements became effective and they commenced receiving their improved benefits. *Id.*

*The Impact Number Process*

30. The so-called "impact number process" is utilized in the event of layoffs due to job movements or product line relocations. *See* Joint Ex. 14 at 4–5. Such layoffs result from "the permanent discontinuance of the manufacturing of a product at a Company Location, provided that product continues to be produced by the Company, but at a different Westinghouse Location." *See* Joint Ex. 11a at 102.

31. When a job movement or product line relocation takes place, the Company estimates the "number of employees on jobs affected" at the location experiencing the job movement or product line relocation. Joint Ex. 14 at 4. This number is also referred to as an "impact number." The Company then assumes that any employee who is laid off from the location is affected by the job movement or product line relocation. *Id.* This assumption continues until the number of employees laid off at the location matches the pre-established impact number. *Id.* The impact number is also reduced by "normal attrition." *Id.* If the impact number is not matched within five years after announcement of the job movement or product line relocation, then impact numbers cease to be available. *Id.*

32. Employees laid off from the location before the impact numbers are used up receive enhanced benefits. For employees with 15 or more years of service, these benefits take the form of a lump sum payment equal to one and one half times a week's pay for each full year of service. Employees can elect one of the regular LIB options instead of the lump sum. Employees age 50 with at least 25 years of service can elect early retirement instead of the lump sum payment. *Id.* at 4–5.

### Limitation of Retirement Benefits to Employees Eligible At Time of Layoff or Death

33. Westinghouse retirement benefits are distributed according to eligibility criteria comprised of various combinations of age and years of service. The 1979 pension plan criteria are set forth in paragraphs 2–5, *supra.* The 1982 pension plan criteria are set forth in paragraphs 9–15, *supra.* In order to receive benefits, employees must have attained one of the requisite age and service combinations at the time of retirement or layoff.

34. Both the 1979 and 1982 Westinghouse Pension Plans provide benefits to the spouses of employees who died before attaining retirement age. To qualify for such benefits, the recipient spouse must have been married to the deceased employee for at least one year. Furthermore, the deceased employee must have completed 30 years of service, or have attained age 50 and completed 15 years of service, or have attained age 60 and completed 10 years of service. *See* Joint Ex. 1 at 8; Joint Ex. 3 at 3.

35. Eligible spouses receive monthly pension payments for life. In any event, payments attributable to the contributory portion of the pension plan are guaranteed for 60 months. Thus, if the spouse dies before receiving 60 payments, the balance due from the contributory portion of the plan is paid to a designated beneficiary. *See* Joint Ex. 1 at 8; Joint Ex. 3 at 3.

## DISCUSSION

### Issues In The Case

The EEOC charges that each of the above-described plans violates the ADEA. I will briefly describe plaintiff's arguments, as well as Westinghouse's responses. I will then analyze the merits of the parties' contentions.

1. The EEOC contends that the interaction of eligibility criteria for retirement and pension benefits with eligibility criteria for severance pay violates the ADEA because it results in denial of severance pay on the basis of age. Under the 1979 pension plan, employees who were laid off and were eligible for any type of retirement could not receive severance pay. Under the 1982 pension plan, laid off employees who were eligible for retirement could choose between pension benefits and severance pay, but could not receive both. Until September, 1985, management personnel who were eligible for retirement were not eligible for severance pay.

Westinghouse contends that the interaction of its severance pay plans and pension benefits plans does not violate the ADEA. On the contrary, it argues that the plans are *bona fide* employee benefit plans exempt from the ADEA. *See* 29 U.S.C.A. § 623(f)(2).

2. The EEOC contends that ARP I and ARP II effectively forced or induced older laid off employees to retire and take their pensions. The EEOC interprets the ADEA to require distribution of both LIB and pension benefits; it contends that employees would not have participated in ARP I and ARP II if they had been able to take both LIB and their pensions.

In response, Westinghouse avers that participation in ARP I and ARP II was voluntary. According to Westinghouse, employees participated in ARP I and ARP II because "the total package of early retirement benefits was more valuable to them than LIB would have been and because the ARP programs offered 'consider-

able [benefits] in favor of the pensioner.'" *See* Defendant's Post-Trial Brief at 63.

3. The EEOC challenges

the terms of the Pension Plan that preclude a laid off employee who was not old enough to retire when laid off from retiring upon attaining the minimum age. For example, an employee laid off at age 58 with 10 years of service cannot retire when he turns 60. Instead, the employee is limited to a lower Vested pension, without a pension supplement and without continuation of insurance.

Plaintiff's Post-Trial Memorandum at 59. According to the EEOC, the employee who is laid off with the requisite years of service should receive benefits when he or she attains the requisite age. For example, if an employee with 15 years of service is laid off at age 48, then benefits should commence when the employee turns 50.

The EEOC similarly challenges the limitation of death prior to retirement benefits to spouses of employees who were actually eligible for them at the time of death. According to the EEOC, benefits should be distributed upon the anniversary of the deceased's qualifying birthday. That is, if an employee dies with 15 years of service dies at age 48, then benefits should commence when the deceased would have turned 50.

Westinghouse contends that the limitation of retirement benefits and death prior to retirement benefits to employees and spouses of employees actually eligible at the time of layoff or death is permissibly justified by cost considerations.

4. Because layoffs proceed on a "last hired, first fired" basis, employees most likely to receive impact numbers and consequent enhanced benefits are those with the least seniority. The EEOC therefore contends that the impact number process discriminates against older employees because they are disproportionately unable to receive impact number benefits.

Westinghouse contends that this effect is the result of a *bona fide* seniority system exempt from the ADEA. *See* 29 U.S.C.A. § 623(f)(2).

5. Westinghouse offers three affirmative defenses to the EEOC's charges. First, it contends that the EEOC is estopped from challenging the 1982 pension plan. Second, it argues that the EEOC did not meet its statutory obligation to conciliate any alleged violations other than those in the original complaint. Third, it argues that the EEOC's amended complaints are barred by the statute of limitations. Westinghouse therefore urges that all allegations other than those in the original complaint pertaining to the 1979 plan should be dismissed.

6. The final issues in this case involve the question of willfulness. Under the ADEA, a finding of willfulness triggers application of a three year statute of limitations. It also triggers availability of liquidated damages. If I find Westinghouse in violation of the ADEA, I must therefore determine three things. First, I must select the applicable willfulness standards for statute of limitations and liquidated damages purposes. Second, I must determine whether the three year statute of limitations applies to this case. Third, I must determine whether liquidated damages are available to the plaintiffs in this case.

I will begin with defendant's affirmative defenses. Next, I will consider the validity of defendant's LIB and pension plan arrangements. I will then consider the remaining challenged practices: ARP I and ARP II, the limitation of retirement benefits and death prior to retirement benefits to employees and spouses of employees actually eligible at the time of layoff or death, and the impact number process. Finally, I will take up the willfulness issues.

*Defendant's Affirmative Defenses*

I reject defendant's affirmative defenses. Thus, the EEOC is not barred from litigating any of its claims and all of the above-described issues are properly before this court.

1. Estoppel

In 1982, Westinghouse changed its programs to provide an option between LIB

and pension benefits. It claims that these changes were made in reliance upon statements made by the EEOC. It therefore argues that the EEOC is estopped from challenging Westinghouse's 1982 practices.

Westinghouse's estoppel claim is based upon events in another lawsuit in the United States District Court of New Jersey.[3] In the course of that litigation, counsel for the EEOC argued that provision of an option between LIB and pension benefits would satisfy the ADEA. Specifically, counsel for the EEOC stated: "What they are entitled to be is made whole under ... the Age Section, and to be made whole they are only entitled to that option, [between taking early retirement benefits or severance pay] whichever one they accepted." See D.Ex. 38(b) at 37–38. Westinghouse also relies upon arguments made by the EEOC in a reply brief filed with the Third Circuit during its appeal from the District Court's decision. The pertinent terms of the brief stated: "the Commission has always asserted that the employee age 55 and over should have had the option to choose either severance pay or early retirement payments.... Such an option would not have been discriminatory." See D.Ex. 38(a) at 8–9.

■■■ In order to establish estoppel under the ADEA, Westinghouse must show that it acted in good faith conformity with, and in reliance on, a written administrative regulation, order, ruling, approval, or interpretation of the EEOC. See 29 U.S.C.A. § 259 (West 1985) (Portal-to-Portal Act, incorporated into ADEA by 29 U.S.C.A. § 626(e)). Reliance upon an oral declaration of an agency official is not sufficient to estop the government. See Anness v. United Steelworkers of America, 707 F.2d 917, 921–22 (6th Cir.1983) (interpreting estoppel provisions of ADEA). This means that Westinghouse must have relied upon a formal, written agency pronouncement. Id.

■■■ To establish non-statutory, equitable estoppel, Westinghouse must demonstrate the existence of several elements. These are: 1) EEOC words, acts, conduct or acquiescence causing Westinghouse to believe that an option arrangement would satisfy the ADEA, 2) EEOC willfulness or negligence with regard to such acts, conduct or acquiescence, and 3) detrimental reliance by Westinghouse. See Lovell Manufacturing v. Export-Import Bank of the United States, 777 F.2d 894, 898 (3d Cir.1985). Westinghouse's reliance must have been reasonable. Id. (quoting Heckler v. Community Health Services of Crawford County, Inc., 467 U.S. 51, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984)). Finally, because Westinghouse seeks to estop the government, there must have been some affirmative misconduct on the part of the EEOC. Id. at 899.[4]

---

**3.** The litigation, entitled *EEOC v. Westinghouse Electric Corporation,* is reported at 577 F.Supp. 1029 (D.N.J.1982). The case involved a challenge to Westinghouse's denial of LIB to employees, laid off from Westinghouse's Belleville, New Jersey plant, who were eligible for retirement benefits. The District Court granted Westinghouse's motion for summary judgment. The Third Circuit reversed the grant of summary judgment and remanded the case to the District Court. See 725 F.2d 211 (3d Cir.1983). The United States Supreme Court denied certiorari. See —— U.S. ——, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984).

**4.** Westinghouse urges that this case is a private action because the EEOC seeks money due to individual citizens. Westinghouse therefore argues that it is seeking to estop a private party rather than the government. Nonetheless, I find that this case involves estoppel of the government.

"[T]o the extent that a Title VII suit by the EEOC seeks recovery of sums due individual citizens ... it is a private and not a public action...." *EEOC v. American Machine & Foundry, Inc.,* 13 Fair Empl.Prac.Cas. (BNA) 1634, 1626 (M.D.Pa.1976). "[T]o the extent that it seeks other relief, such as an injunction against future discriminatory practices, it is a public action...." This case obviously includes public action features. Moreover, estoppel in this case presents considerations of public importance, because Westinghouse seeks to use statements made in the course of litigation to estop subsequent litigation.

When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well-settled that the Government may

■ I find that Westinghouse has not established the elements of estoppel. First, even assuming that the words or acts of counsel for the EEOC caused Westinghouse to change its LIB and pension plans, and even assuming that counsel for the EEOC acted willfully or negligently and engaged in affirmative misconduct, any reliance by Westinghouse was unreasonable.

■ The EEOC is not bound by erroneous statements of its trial counsel. *See Donovan v. I and J, Inc.*, 567 F.Supp. 93, 104 (D.N.M.1983). EEOC trial counsel had no actual or apparent authority to speak for the agency as a whole. *Cf. Santos v. Franklin*, 493 F.Supp. 847, 855–56 (E.D.Pa. 1980) (actual and apparent authority of government actor are relevant to estoppel). Westinghouse's experienced counsel were well aware of the limits of EEOC counsel's authority. Any reliance on EEOC counsel's statements was therefore unreasonable.

Westinghouse's purported reliance is also unreasonable because of the nature and context of the statements of EEOC counsel. The statements were not official agency pronouncements directed towards charting a course of future conduct. On the contrary, they were arguments made in the process of advocacy. Such statements do not bind the EEOC. *See Heckler v. Community Health Services of Crawford County, Inc.*, 104 S.Ct. at 2227; 29 U.S. C.A. § 259 (requiring formal, written agency pronouncement for estoppel under the ADEA).

■ At bottom, I find that Westinghouse in fact did not rely upon the statements of EEOC trial counsel. Instead, the 1982 change was an independent tactical decision made for a perceived litigation advantage. Stuart Saltman, Westinghouse Chief Counsel for Human Resources, testified that he reviewed the transcript of EEOC trial counsel's statements made in the District Court of New Jersey. He then recommended that "serious consideration" be given to "attempting to ... cut off future liability with respect to the issues that were involved in the L.I.B. ... litigation ... and serious consideration be give[n] [sic] to cutting down future liability by adopting the position that EEOC had taken as reflected in the statements...." *See* T. Sept. 10 at 42 1. 9–15. Mr. Saltman's recommendation was based upon more than the transcript, however. He testified that it stemmed from

> continuing familiarity with the position that the EEOC had taken, which I had both heard from others and seen in the documents that had been submitted to me over the course of the history of this thing.... This [transcript] was a confirmation in writing writing, of the fact that that was the EEOC's position ... in 1978. ...[t]he attorney on my staff who was handling the case walked in, sat down in my office and said he had been talking to the Department of Labor about the charge ... and said that the Department of Labor in essence takes the position that the plan is illegal because it didn't provide an option.

*See* T. Sept. 10 at 48–50.[5] Mr. Saltman thus perceived what he believed was the government's "informal position" as early as 1978, but the Company made no change until July, 1982. The change was set in motion no earlier than March, 1982. *See id.* at 51. The delay suggests that the

---

not be estopped on the same terms as any other litigant.
*Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). Estoppel in this case would affect the ability of government agencies effectively to litigate issues of public importance. It might foster hesitant advocacy. It might also foster hindrance of government counsel through their predecessors' mistaken or hasty statements. Standards for estoppel of the government therefore should apply.

**5.** Neither Mr. Saltman nor anyone else at Westinghouse ever attempted to ascertain whether this was in fact the EEOC's position. *See* T. Sept. 10 at 18–20. Statements that may have been made by Department of Labor lawyers cannot bind the EEOC, for the same reasons that the Commission is not bound by the statements of trial counsel. *See Donovan v. I and J, Inc.*, 567 F.Supp. 93, 104 (D.N.M.1983).

Company did not rely upon the statements of EEOC trial counsel.

Even if there was reliance, it was not detrimental, because Westinghouse did not change its position for the worse. Westinghouse claims that its 1979 plan was valid; it implemented the 1982 plan as an independent business and legal judgment to reduce the risks of future liability. *See* T. Sept. 10 at 42 1. 4–24, 43 1. 1–8. If the statements had not been made, Westinghouse would have defended its 1979 plan. In short, Westinghouse's position did not change in reliance on the EEOC lawyer's argument in the New Jersey case.

■ Finally, there is no sign of any affirmative government misconduct supporting estoppel. *See Donovan v. I and J, Inc.*, 567 F.Supp. at 103–04. Mere provision of erroneous information is usually not sufficient to establish estoppel. *See Portmann v. United States*, 674 F.2d 1155, 1165 (7th Cir.1982); *Donovan v. I and J, Inc.*, 567 F.Supp. at 104. At minimum, estoppel appears to require an "affirmative misrepresentation." *See Santos*, 493 F.Supp. at 853. The statements at issue in this case cannot be so characterized. Trial counsel's statements were not affirmative misrepresentations because his role did not involve policymaking. He was arguing a case, not stating EEOC policy.[6]

2. EEOC Good Faith and Conciliation

■ According to Westinghouse, the EEOC failed to conciliate any claims other than those regarding the pre-1982 LIB program at the Belleville, New Jersey and Lester, Pennsylvania facilities. The Company therefore urges that all other charges should be dismissed. Under the ADEA, the EEOC must "attempt to eliminate the discriminatory practice or practices alleged, and to effect voluntary compliance with the requirements of [the ADEA] through informal methods of conciliation, conference, and persuasion." *See* 29 U.S.C.A. § 626(b). This means that the Commission must give employers an opportunity to comply voluntarily with the ADEA. *See Brennan v. Ace Hardware Corp.*, 495 F.2d 368, 374 (8th Cir.1974). " 'Formal methods' " of enforcement are to be applied " 'only in the ultimate sense.' " *Id.* (quoting legislative history). In practice, fulfillment of the obligation to conciliate must be evaluated on the facts in each case. *See Marshall v. Sun Oil Company (Delaware)*, 605 F.2d 1331, 1334 (5th Cir.1979). Nonetheless, some requirements appear to be common to all cases. The employer must be told how to achieve compliance; "[p]ersuasion cannot be accomplished if the desired goal is unknown." *See Brennan*, 495 F.2d at 375. Specifically, the employer should be informed (1) of the ways compliance may be achieved, (2) that affected employees may receive "make whole" remedies, (3) that the Commission may institute legal action, and (4) that the employer may respond to the Commission's allegations. *See Marshall v. Sun Oil Company (Delaware)*, 605 F.2d at 1334–35; *see also Brennan*, 495 F.2d at 375. I find that the Commission met all of these requirements.

Westinghouse was made aware that the Commission's goal was elimination of the named practices. Westinghouse also knew that "make whole" remedies were implicated, because the Commission advised Westinghouse that "full restitution" in the initial Slackway case entailed full eligibility for LIB. *See* P.Ex. 4C. The letters of violation issued to Westinghouse advised the Company of the Commission's allegations, invited conciliation, and explicitly referred to the possibility of litigation.

---

6. Westinghouse has renewed its efforts to establish estoppel by submitting a motion to supplement the trial record and defendant's post-trial brief. Westinghouse seeks to submit transcripts of congressional hearings regarding the appointment of Jeffrey Zuckerman as General Counsel for the EEOC. Statements made by Mr. Zuckerman purportedly support defendant's position on the issues of estoppel, the statute of limitations, and willfulness. Defendant's motion grabs at straws. Mr. Zuckerman's testimony at a confirmation hearing presumably reflects his personal position regarding EEOC enforcement. Because of their nature and context, his statements cannot bind the EEOC. Moreover, Westinghouse obviously did not rely on these statements made long after the period at issue in this case.

Moreover, a follow-up to the July 16, 1984, letter of violation advised Westinghouse that "while we will continue to attempt to reach a voluntary settlement of this case, the case will be referred to the Legal Unit for litigation consideration." *See* P.Ex. 4E, 4F, & 4G.

■ The Commission also fulfilled its duties in the actual conciliation process. The EEOC's compliance with its obligation to conciliate is measured by the effort it expends. *See, e.g., EEOC v. KECO Industries, Inc.,* 748 F.2d 1097, 1102 (6th Cir. 1984) (court should only determine whether EEOC attempted conciliation; form and substance is within EEOC discretion); *EEOC v. Prudential Federal Savings & Loan Association,* 763 F.2d 1166, 1168 (10th Cir.) (enough that Commission makes a sufficient albeit limited effort to conciliate), *cert. denied,* — U.S. —, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985). The EEOC's efforts are sufficient if "it makes a sincere and reasonable effort to negotiate by providing the defendant an 'adequate opportunity to respond to all charges and negotiate possible settlements.'" *See id.* at 1169 (quoting *Marshall v. Hartford Fire Insurance Company,* 78 F.R.D. 97, 107 (D.Conn. 1978)).

■ The EEOC's conciliation attempts in this case met these criteria. In June, 1983, the Commission attempted to conciliate the initial Slackway charge. *See* P.Ex. 4B, 4C. After meeting with the EEOC, Westinghouse rejected the Commission's conciliation proposal. *See* P.Ex. 4C. The EEOC then advised Westinghouse that it would consider litigation but would also continue to attempt a voluntary settlement. *See* P.Ex. 4D. On July 16, 1984, the EEOC issued its second letter of violation. The letter added new charges, and again offered conciliation. *See* P.Ex. 4E. Westinghouse did not respond to the conciliation

offer. *See* P.Ex. 4F. On September 14, 1984, the EEOC issued its third letter of violation. This letter expanded the case to nationwide scope, and again offered conciliation. *See* P.Ex. 4G. Once again, Westinghouse did not respond to the conciliation offer. *See* T. Sept. 10 at 64 1. 1–19. Finally, I ordered a conciliation effort. Pursuant to my order, a conciliation conference took place in January, 1985. *See id.* at 67–70. Westinghouse subsequently informed the EEOC that it found the Commission's conciliation proposal "unacceptable in its present form." *See* P.Ex. 4H. Clearly, the Commission made a sustained conciliation effort.

Westinghouse alleges that the Commission's efforts were not genuine, because the EEOC acted in bad faith. Westinghouse supports this allegation with several arguments. First, Westinghouse argues that the EEOC could not, and did not, approach conciliation in good faith once it began litigation on the Slackway charge. Second, Westinghouse contends that the Commission did not adequately investigate the charges leveled in its letters of violation. Third, Westinghouse argues that the EEOC demonstrated bad faith by giving Westinghouse too short a time to respond to the letters of violation.[7] Finally, Westinghouse contends that the EEOC came to the court-ordered conciliation with five new inadequately investigated allegations, ignored court orders to suspend discovery during the conciliation period, and revealed its insincerity by designating its trial attorney as its conciliator.

■ I find that the EEOC acted in good faith. It is of no consequence that the EEOC added, and attempted to conciliate, charges after filing a judicial complaint. Once a letter of violation has been sent, the employer is well aware that litigation may

---

7. The July 16, 1984, letter of violation gave Westinghouse until July 23, 1984, to accept in writing the Commission's conciliation offer. The letter instructed that failure to respond by that date would lead the Commission to presume that Westinghouse rejected the conciliation offer. *See* P.Ex. 4E. Similarly, the September 14, 1984, letter of violation requested a written response by September 24, 1984, and advised that failure to respond would be interpreted as a rejection of conciliation. *See* P.Ex. 4G. Westinghouse incorrectly interprets these short response times as a sign that the EEOC was not anticipating or hoping for conciliation.

ensue. Thus, "[a]ctions initiated by the Secretary before the termination of conciliation would not place undue pressure on the employer to settle the charges...." *See Vance v. Whirlpool Corporation,* 707 F.2d 483, 488 (4th Cir.), *modified* on other grounds, 716 F.2d 1010 (4th Cir.1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1600, 2678, 81 L.Ed.2d 873 (1984). While it is true that "a Commission lawsuit brought before any attempt at conciliation is premature," *see EEOC v. Hickey Mitchell Co.,* 507 F.2d 944, 948 (8th Cir.1974) (Title VII case), a suit is not premature once conciliation has commenced. What is crucial is provision of an opportunity to conciliate. *See id.*

■ I find that Westinghouse was provided with conciliation opportunities. Westinghouse was informed adequately of the Commission's allegations. The letters of violation named specific Westinghouse policies and practices. While the EEOC did not give Westinghouse a great deal of time to consider its charges and conciliation offers, Westinghouse only had to make an initial decision whether to respond in good faith. A full-blown answer was not required. Thus, the Company was given an adequate response time. Nonetheless, it did not respond.

■ The fact that the Commission did not limit itself to the charges enumerated at the outset does not mean that it acted in bad faith. The EEOC is not limited to its initial allegations; rather "a complaint filed by the EEOC is limited to the investigation *reasonably expected* to grow out of the initial charge of discrimination." *EEOC v. KECO Industries, Inc.,* 748 F.2d 1097, 1101 (6th Cir.1984). In *KECO Industries, Inc.,* an individual sex discrimination charge broadened into an EEOC claim on behalf of all of the defendant's female employees. The Sixth Circuit held that this was proper because "the only difference between the later charge and ... initial

charge is the number of persons victimized.... As this later class-based claim brought by the EEOC could have reasonably been expected to grow out of Ms. Grimes' individual complaint of discrimination, no new additional proceedings were necessary." *See id.* at 1101.[8] Because all of the allegations in this case involve the operation of defendant's LIB and pension plans, Westinghouse could "reasonably have expected" the additional charges in the EEOC's second and third letters of violation to grow out of the initial Slackway charge regarding denial of LIB.

■ Westinghouse's arguments in effect urge that the Commission must thoroughly investigate and present all charges at the outset of the conciliation process, and that the filing of a court complaint bars all further investigation, conciliation, or development of the case. I disagree. The EEOC does not have to conduct an exhaustive investigation before it may act. *See e.g., Marshall v. Hartford Fire Insurance Co.,* 78 F.R.D. 97 (D.Conn.1978).

An independent requirement of exhaustive investigations would reward the employer who discriminates on a large scale and undermine the legislative goal of obtaining voluntary compliance in these cases. The large scale discriminator would present the Secretary with an onerous and costly burden of investigation if the Secretary were required to prove each individual case of discrimination. Because a limited number of investigators is available, such a burden would frustrate the Secretary's ability to attempt conciliation in many cases.

*See Marshall v. Sun Oil Co. (Delaware),* 605 F.2d at 1334–35. In sum, "[t]o allow the employer an opportunity to answer its allegations, the Department should reveal its basis for making them, even though that basis is only circumstantial evidence. But the Secretary has no obligation to

---

8. *EEOC v. KECO Industries* is a Title VII case, but its principles also apply to the ADEA. The ADEA and Title VII are parallel statutes; the substantive provisions of the ADEA "were derived *in haec verba* from Title VII." *Lorrillard*

*v. Pons,* 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978); *Hodgson v. First Federal Savings & Loan Association,* 455 F.2d 818, 820 (5th Cir.1972).

'prove' to the employer that he has committed acts of discrimination." *Marshall v. Hartford Fire Insurance Co.*, 78 F.R.D. at 105.

It is important to " 'evaluate one party's efforts with an eye to the conduct of the other party.' " *See EEOC v. Prudential Federal Savings and Loan Association*, 763 F.2d at 1169 (quoting *Marshall v. Sun Oil Co.*, 605 F.2d 1331, 1335 (5th Cir.1979)). In this case, defendant rejected the EEOC's first conciliation proposal. Defendant did not even respond to the second and third conciliation offers.

In fact, the evidence suggests that Westinghouse never gave serious consideration to the possibility of conciliation. Mr. Saltman, Chief Counsel for Human Resources for Westinghouse, testified that he decided that the EEOC was acting in bad faith and was conducting a "sham conciliation, investigation and determination process...." *See* T. Sept. 10 at 65 1. 7–10. This arrogant attitude shot down plaintiff's efforts toward conciliation.

Westinghouse simply chose to play hardball. It took the position that it had not violated the ADEA, *see id.* at 56–66; P.Ex. 4C. Given the Company's position, the EEOC appropriately acted. "[C]ourts have held that the Secretary is not required to continue conciliation efforts after the defendant has stated that it believes it has not been guilty of wrongdoing but may proceed to litigation to determine that issue." *See Marshall v. American Motors*

*Corp.*, 475 F.Supp. 875, 879 (E.D.Mich. 1979).

3. The Statute of Limitations And Relation Back Of Amended Complaints

Westinghouse's third affirmative defense is that the claims asserted in the EEOC's amended complaints are barred by the statute of limitations.[9] The EEOC argues that these claims "relate back" to its original complaint and are therefore within the statute of limitations.

The amended complaints in this case pose two problems. First, I must determine whether the EEOC is barred from adding the five new issues that appeared in its first and second amended complaints. Second, I must determine whether the EEOC is barred from broadening the scope of the case to a nationwide challenge, in effect adding new plaintiffs. I conclude that neither the additional allegations nor the broadened scope are barred by the statute of limitations.

Under Rule 15(c) of the Federal Rules of Civil Procedure, an amended complaint that would otherwise be barred by the statute of limitations is considered timely if it "relates back" to the original complaint. Relation back is permitted whenever "the claim ... asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading...." *See* Fed.R.Civ.P. 15(c). Rule 15(c) is liberally interpreted and applied. *See Unicure, Inc.*

---

**9.** The EEOC's original complaint was filed on November 12, 1983. That complaint concerned Westinghouse's denial of LIB to named individuals "and all other terminated or laid-off employees aged 60 and older who were eligible for early retirement benefits and/or received early retirement benefits." On August 23, 1984, the EEOC filed its first amended complaint. The amended complaint alleged the following violations of the ADEA at Westinghouse's Lester, and Concordville, Pennsylvania facilities:

(1) denying layoff income benefits to employees laid off prior to July, 1982 who were eligible for any type of retirement;

(2) after July, 1982, giving laid off employees the option of selecting either LIB or retirement, but not both;

(3) forcing laid off employees to retire prior to age 70 because LIB was not available;

(4) denying early retirement to laid off employees who chose LIB;

(5) denying recall to work to employees who were laid off and forced to retire; and

(6) giving lower retirement benefits to laid off employees who were not eligible for retirement because of age at the time of their layoff, but who later became qualified for retirement benefits.

The EEOC filed its second amended complaint on September 25, 1984. That complaint reiterated the six violations set forth in the first amended complaint, but alleged that they were nationwide.

*v. Thurman,* 97 F.R.D. 1, 6 (W.D.N.Y. 1982).

Standards for the application of Rule 15(c) ensure defendants of notice of the conduct that is ultimately challenged in court. *See Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.,* 690 F.2d 1240, 1259–60 n. 29 (9th Cir.1982), *cert. denied,* 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983). Fair notice of the general fact situation at issue is deemed sufficient. *See* 3 J. Moore, Moore's Federal Practice ¶ 15.15[3] (2d ed. 1985).

■ Thus, under the rule's "conduct, transaction, or occurrence" test, "an amendment need only spring from the same core event or transaction as that set out in the original complaint," *see Drakatos v. R.B. Denison, Inc.,* 493 F.Supp. 942, 945 (D.Ct.1980). The addition of new theories of recovery similarly is permissible when the new claims are not "based on events different from or in addition to those set out in the original complaint." *See Baruah v. Young,* 536 F.Supp. 356, 364 (D.Md.1982); *see also Santana v. Holiday Inns, Inc.,* 686 F.2d 736, 739 (9th Cir. 1982).

■ The concept of notice also guides the addition of parties. "In deciding whether an amendment relates back to the original claim, notice to the opposing party of the existence and involvement of the new plaintiff is the critical element." *Avila v. Immigration and Naturalization Service,* 731 F.2d 616, 620 (9th Cir.1984). Thus, relation back depends upon whether defendants "[a]t some point ... have notice of who their adversaries are." *Leachman v. Beach Aircraft Corp.,* 694 F.2d 1301, 1309. Such notice exists when there is an identity of interests between the old and new plaintiffs. *See id.; see* also 3 J. Moore, *supra,* at 15.15[4.–2].

■ I find that the issues added in the EEOC's first amended complaint relate back to the original complaint. Like the original complaint, the five allegations added in the EEOC's first amended complaint are concerned with defendant's denial of LIB to persons eligible for retirement. Thus, they involve the same "transaction, occurrence, or core events" that appeared in the original complaint.

I find that the expansion of the scope of the litigation in the EEOC's second amended complaint also relates back to the original complaint. Westinghouse knew that its severance pay plans were targeted by the EEOC. These plans were in effect nationwide. Thus, Westinghouse knew that the Commission's challenge could apply to any and all of its facilities. Similarly, to the extent that the expansion of the case added new parties on the plaintiff's side, the new and the old parties have an identity of interest; namely, claims arising out of defendant's severance pay plans. Westinghouse thus had reason to know that any employee affected by the challenged policies was a potential party to this case.

In sum, the issues and interests have remained the same throughout this litigation. The heart of the matter is the legality under the ADEA of defendant's severance pay, pension, and retirement programs. I will now consider those programs.

*The Validity Under the ADEA of Westinghouse's Severance Pay, Retirement, and Pension Plan Arrangements*

■ The standards for determining whether an employer has engaged in age-based employment discrimination are borrowed from Title VII jurisprudence, *see Massarsky v. General Motors Corp.,* 706 F.2d 111, 117 (3d Cir.1983), *cert. denied,* 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983). Plaintiffs may proceed under two theories. Under the disparate treatment theory of discrimination, plaintiffs must demonstrate intentional discrimination; that is, that an employer expressly applies age-based standards in its treatment of employees. *See id.* at 117. Under the disparate impact theory of discrimination, plaintiffs must demonstrate that an employer's application of facially neutral criteria disproportionately and adversely affects older employees, and cannot be justified by business necessity. *Id.*

The EEOC's challenge of seven separate Westinghouse policies presents four legal issues. These are:

(1) whether Westinghouse's denial of LIB and MSA to laid off, retiring employees violates the ADEA;

(2) whether ARP I and ARP II violated the ADEA;

(3) whether Westinghouse's limitation of retirement benefits to employees actually eligible for retirement at the time of layoff, and its limitation of death prior to retirement benefits to spouses of employees actually eligible for the benefits at the time of death, violates the ADEA; and

(4) whether Westinghouse's impact number process violates the ADEA.

The first three issues fall within disparate treatment analysis, while the last issue falls within disparate impact analysis. I will begin with the three disparate treatment issues.

*The Disparate Treatment Issues*

 Under the disparate treatment theory of discrimination, the plaintiff ultimately must demonstrate that the defendant engaged in purposeful or intentional discrimination. *Id.* This task is customarily broken down into several steps. *See id.* at 117–18; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (pattern of proof of disparate treatment).[10]

 "[T]he plaintiff has the initial burden to establish a prima facie case of unlawful discrimination by a preponderance of the evidence." *See Massarsky*, 706 F.2d at 118. This may be done by direct or circumstantial evidence. *See Maxfield v. Sinclair International*, 766 F.2d 788–91 (3d Cir.1985). Once the plaintiff has established a prima facie case, the employer's burden is to "dispel the adverse inference" by "articulating 'some legitimate, non-discriminatory reason'" for its actions. *See Massarsky*, 706 F.2d at 118 (quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824). Once the employer has made this articulation, "the plaintiff must then prove that the asserted reason was merely a pretext for unlawful discrimination." *Id.*

 The ultimate burden of persuasion is at all times with the plaintiff. *Id.* Thus, an ADEA plaintiff must show either that age was a determinative factor in the employer's decision, *Smithers v. Bailar*, 629 F.2d 892, 897–98 (3d Cir.1980), or that the employer's policy is discriminatory on its face. *Massarsky*, 706 F.2d at 119.

 Finally, the employer may escape liability under the ADEA if it can demonstrate that its policy is within one of the statutory exceptions. These exceptions provide affirmative defenses to an employer who would otherwise be found to have engaged in age-based discrimination.[11] *See*

---

**10.** *McDonnell Douglas Corp. v. Green* involved a Title VII claim of intentional race discrimination. The Court set forth the basic pattern of proof giving rise to an inference of discrimination. Under this pattern, a plaintiff can establish a prima facie case by showing:
 (1) that he belongs to a racial minority,
 (2) that he applied for and was qualified for a job for which the employer was seeking applicants,
 (3) that, despite his qualifications, he was rejected, and
 (4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.
*See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).
 While *McDonnell Douglas* embodies the classic pattern of proof of employment discrimina-

tion, it does not rigidly constrain the form of Title VII or ADEA cases. It is merely one way of establishing "an inference of discrimination ... because the conduct at issue is presumed to be based on consideration of impermissible factors in the absence of another explanation." *Smithers v. Bailar*, 629 F.2d 892, 895 (3d Cir. 1980). The nature of the showing that will create such an inference varies upon the circumstances of each particular case. *See Massarsky v. General Motors*, 706 F.2d 111, 118 n. 13 (3d Cir.), *cert. denied*, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983). Thus, the *McDonnell Douglas* formulation has been adapted to a number of different fact patterns under both Title VII and the ADEA.

**11.** Exceptions to the ADEA provide five affirmative defenses. These are: the "bona fide occupational qualification" defense, "reasonable factors other than age" defense, "bona fide se-

*Trans World Airlines v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 622, 83 L.Ed.2d 523 (1985).

### 1. Denial of Severance Pay to Retiring Employees

This issue embraces Westinghouse's pre-July, 1982, LIB and pension plans, its post-July, 1982, LIB and pension plans, and its MSA and managerial pension plans. The validity of these programs depends on whether the ADEA permits denial of severance pay to laid off employees who retire and take their pension benefits.[12]

██ I find that Westinghouse's denial of severance pay to employees who take retirement is age-based discrimination.[13] Defendant's programs give employees who are eligible for retirement no practical choice but to take retirement benefits and forego severance pay. Therefore, receipt of severance pay is conditioned upon non-retirement status, and laid off workers are treated differently on the basis of age.

Westinghouse asserts that its programs have a "legitimate, non-discriminatory" justification. This justification is defendant's purported policy against "double dipping" into Westinghouse benefit programs.[14] According to Westinghouse, its benefit programs are designed to ensure each laid off employee a "stream of income"; however, each income stream may flow from only one source. Defendant thus argues that severance pay is not denied on the basis of age but on receipt of an income stream in the form of pension benefits.

This policy allegedly has existed since the 1960 inception of LIB. Westinghouse's Director of Compensation Benefits and Human Resources Program testified that "[t]he LIB plan never intended to have any relationship to retirees who had already been provided by the company with an income stream. We were not interested in providing the doubledip in the corporate coffers for retirees." *See* T. Sept. 5 at 64 1. 10–14.

I do not believe defendant's doubledipping rationale, because it is inconsistent. Specifically, the severance pay plans make an exception for employees age 59 with more than 10 but less than 30 years of service. If an employee in this category is laid off, he or she may receive LIB until attaining age 60.[15] At age 60, the employee can take full early retirement benefits, including medical insurance and a supplementary pension. *See* Jt.Ex. 13 at 4; Jt.Ex. 14 at 7. This arrangement is contrary to the alleged doubledipping rule. No such arrangement is provided for 57 year old employees with 30 years of service, who are one year shy of eligibility for selected retirement. Defendant supports its treatment of the 57 year olds with the alleged doubledipping rule. *See* T. Sept. 5 at 65–72.

niority system" defense, "bona fide employee benefit plan" defense, and "discharge for good cause" defense. *See* 3 A. Larson & L. Larson, *Employment Discrimination* § 100.00 (1984).

**12.** The post-July, 1982, program provides laid off employees with an option between LIB and pension benefits. In practice, this "option" is not a practical choice for employees, because selection of LIB means forfeiture of insurance and medical benefits. *See, e.g.,* T. Sept. 5, 132–133; Sept. 6, 7–9, 79–82. In any event, provision of the option does not alter the fact that older employees cannot receive both LIB and their full pension benefits. The option feature therefore does not correct the program; rather, Westinghouse devised the "option" as a sham to prolong the litigation of this issue.

**13.** In *EEOC v. Westinghouse,* 725 F.2d 211 (3d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984), the Third Circuit found that the EEOC had established a case surviving summary judgment that the Company's pre-July, 1982, program violated the ADEA. On that record, the Court rejected the assertion that the plan was based on reasonable factors other than age or a bona fide benefit plan. *See id.* at 222–23. The case was remanded. *See id.* at 225.

**14.** Westinghouse apparently did not offer the doubledipping rationale to the Third Circuit. *See EEOC v. Westinghouse,* 725 F.2d 211 (3d Cir.1984) (no mention of doubledipping argument); *see also* T. Sept. 4 at 65 1. 4–18 (statement of Westinghouse counsel that issue was not before Third Circuit).

**15.** The LIB may not, however, be taken in lump sum form. *See* Jt.Ex. 13 at 4; Jt.Ex. 14 at 7.

█ Westinghouse attempts to explain this inconsistency by arguing that the exception for 59 year olds is a result of collective bargaining. It also insists that the exception is not doubledipping. *See* T. Sept. 5 at 66–67. This explanation does not wash. The collective bargaining process does not protect invalid plans, *see* 29 U.S. C.A. § 623(c). Moreover, Westinghouse's insistence that the 59 year olds do not doubledip, but the 57 year olds would, makes no sense.

Another inconsistency is defendant's assertion that severance pay "provide[s] the income stream only when [the employee] did not have an income stream from some other source," *see* T. Sept. 5 at 63 1. 18–25. In reality, severance pay is available to employees who have other sources of income. For example, if employees elect not to receive severance pay during the 12 month period after layoff, and obtain other employment during that period, they can still receive severance pay at the end of the period. *See id.* at 50 1. 7–18.

█ The doubledipping rationale is nonsense. Its unstated premise is that severance pay and pension benefits are fungible. In actuality, they are distinct benefits with different purposes. Severance pay is a short term separation allowance. It affords an employee breathing room to think through his situation and alternatives, and provides time to seek new employment without starving. In contrast, the pension is a provision for long term retirement. In short, severance pay is a fringe benefit related to length of service and the occurrence of a layoff. *See EEOC v. Westinghouse*, 725 F.2d at 224–25; *cf. EEOC v. Bordens, Inc.*, 724 F.2d 1390, 1396–97 (9th Cir.1984) (Borden's severance pay policy

was a "simple fringe benefit" rather than a part of its retirement and pension benefits package). Pension benefits are not a substitute for severance pay.[16]

█ Westinghouse denies that its policy discriminates on the basis of age. Defendant asserts that the criterion for receipt of severance pay is not age but non-retirement status. I reject this argument. Age and retirement are, in fact, so closely linked that a criterion based on one is a criterion based on the other. *See EEOC v. Bordens, Inc.*, 724 F.2d 1390, 1393 (9th Cir.1984) (rejecting a severance pay arrangement similar to Westinghouse's); *EEOC v. Curtiss-Wright Corp.*, 34 Empl. Prac.Dec. ¶ 34, 483 (CCH) (D.N.J.1982) (age is a determinative factor when severance pay is based upon retirement status).

*Massarsky v. General Motors Corp.*, upon which defendants rely, is distinguishable. *Massarsky* upheld a policy which insulated from layoff employees enrolled in an academic/work-experience program. Although participants in the program tended to be young employees, the Court found that "[t]here is nothing to indicate that older persons were precluded from becoming GMI students.... We simply cannot infer that the Company was using student status as nothing more than a proxy for age...." *Massarsky*, 706 F.2d at 119. In contrast, this case invites such an inference. Retirement status is not an age-neutral factor. Unlike enrollment in the GMI program, it is related solely to age.

█ Finally, Westinghouse invokes the bona fide employee benefit plan defense. *See* 29 U.S.C.A. § 623(f)(2). An employer claiming this defense must establish three things. These are: (1) that the

---

**16.** Westinghouse itself recognizes the distinction between severance pay and pension benefits. In reference to MSA and PRIP, managerial employees were told "[t]hey are not a part of any contract of employment and no employee shall have any legal or other right to benefit under the plans." *See* Jt.Ex. 20 at 2. This characterization clearly differentiates MSA from pension benefits.

The fact that LIB and MSA are fringe benefits not required to be provided does not mean that

Westinghouse may discriminatorily distribute them. *See Hishon v. King & Spaulding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). "A benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free under the employment contract simply not to provide the benefit at all." *Id.* at 2234; *see also Thurston*, 105 S.Ct. at 621 (applying *Hishon* to ADEA context).

employer was acting in observance of the terms of (2) a bona fide employee benefit plan (3) which is not a subterfuge to evade the purposes of the ADEA. *See Westinghouse,* 725 F.2d at 223. I conclude that Westinghouse has not established the second and third elements of the defense.

■■■■ The second element requires the plan observed to be "a bona fide employee benefit plan." This generally means that the plan must exist and pay substantial benefits, *see EEOC v. Bordens, Inc.,* 724 F.2d at 1395 (citing *Marshall v. Hawaiian Telephone Co.,* 575 F.2d 763, 766 (9th Cir.1978)). Although the Westinghouse plans exist and involve real monetary benefits, its severance pay programs are not "employee benefit plans" within the meaning of the ADEA. *See Westinghouse,* 725 F.2d at 224–25. Severance pay lacks the characteristics of true employee benefit plans. *See id.* at 224; *Bordens,* 724 F.2d at 1396. The severance pay and pension plans interact, but this does not mean they integrate. *See Westinghouse,* 725 F.2d at 225. A fringe benefit cannot be made part of a bona fide employee benefit plan, as here, "simply by artificially trying to tie the benefit to such a plan." *See Alford v. City of Lubbock,* 664 F.2d 1263, 1272 n. 12 (5th Cir.), *cert. denied,* 456 U.S. 975, 102 S.Ct. 2239, 72 L.Ed.2d 848 (1982) (analyzing denial of sick leave pay to employees not covered by state retirement plan).

Even if severance pay could be considered part of an employee benefit plan, Westinghouse has not established the third element of the bona fide employee benefit plan defense. Relying on *United Air Lines v. McMann,* 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977), defendant argues that its plan cannot be a subterfuge because it pre-exists the ADEA. *McMann*

held that Congress did not intend to invalidate retirement plans that pre-date the ADEA, *see id.* at 203, 98 S.Ct. at 450. The continued vitality of *McMann* is unclear.[17] *See* 1 H. Eglit, *Age Discrimination* § 16.-36 (1985). To the extent that *McMann* still has force, Westinghouse misapplies it. I therefore reject defendant's argument.

■■■ First, *McMann* does not insulate post-Act modifications of benefit plans. *See EEOC v. Home Insurance Co.,* 672 F.2d 252, 259 n. 9 (2d Cir.1982); *Sikora v. American Can Co.,* 622 F.2d 1116, 1124 (3d Cir.1980). Such modifications can be subterfuges. *See Home Insurance Co.,* 672 F.2d at 259. Westinghouse's plans have undergone negotiation, adjustment, and consideration many times since the passage of ADEA. It is therefore incorrect to characterize them as bona fide under *McMann.* They are, in fact, a subterfuge to evade the Act's proscription of age discrimination.

■■■ Second, defendant's *McMann* argument proves too much. It is true that an employer cannot intend to evade a nonexistent law; thus, pre-Act conduct cannot be a subterfuge. This would be true even if the employer was in fact discriminating against older employees.[18] Once a law is in existence, however, the employer is aware of its prohibitions. Post-Act reaffirmation of prior discriminatory practices, such as defendant's, therefore amounts to evasion of the Act. This is not to say that an employer must predict which details of its plans would be declared violations of the Act if challenged in court. Nonetheless, it is too much to say that any pre-Act practice can *never* be a subterfuge simply by virtue of its continuation, with few or no changes, after passage of the ADEA.

---

17. When Congress amended the ADEA in 1978, it explicitly rejected *McMann. See* H.R.Rep. No. 950, 95th Cong., 2d Sess. 8, *reprinted in* 1978 U.S.Code Cong. & Ad.News 528, 529. The conferees "specifically disagree[d] with the Supreme Court's holding and reasoning in that case." *Id.* The conferees also expressed their belief that "[p]lan provisions in effect prior to the date of enactment are not exempt under

section 4(f)(2) by virtue of the fact that they antedate the act or these amendments." *Id.*

18. This is not the same as saying that pre-Act plans necessarily were free of discriminatory purposes. Intention to discriminate does not arise simultaneously with a law; rather, the law recognizes it as illegal.

▮ In sum, I am not persuaded by Westinghouse's purported "no doubledipping" rationale; instead, I find that it is a pretext for discrimination on the basis of age. I also find that Westinghouse cannot invoke the ADEA's "bona fide employee benefit plan" exception. I therefore conclude that Westinghouse's denial of severance pay to retiring, laid off employees violates the ADEA.

*The Legality Under the ADEA of ARP I and II*

▮ The ADEA prohibits mandatory retirement prior to age 70. *See* 29 U.S.C.A. §§ 623(f), 631(a).[19] This prohibition extends to forced retirements. It also extends to unlawfully induced "voluntary" retirements. *See* B. Schlei & P. Grossman, *Employment Discrimination Law*, 519 (2d ed. 1983). "If pressure, subtle or otherwise, is used to encourage 'voluntary' retirement, liability may result." *Id.* The EEOC asserts that ARP I and ARP II illegally induced employees to retire. This argument has two components. First, the EEOC contends that employees would not have participated in ARP if they could have received both pension benefits and severance pay. Second, the EEOC contends that employees were induced to participate in ARP because of the manner in which defendant notified them of layoff and informed them of their options.

To the extent that the first component of the argument complains of employees' inability to obtain both severance pay and pension benefits, I have already determined that the practice is illegal. The remaining portions of plaintiff's argument present the contention that the company unlawfully induced employees to participate in ARP and retire.[20]

▮ The legality of providing enhanced benefits to encourage early retirement is not always clear. *See* 1 H. Eglit, *supra*, at § 16.39B (Supp. Aug. 1985). Nonetheless, plans such as ARP I and II, which provide benefits to encourage early retirements and thereby forestall layoffs of younger workers, are permitted. *See, e.g., Patterson v. Independent School District # 709*, 742 F.2d 465 (8th Cir.1984); *Sutton v. Atlantic Richfield Co.*, 646 F.2d 407, 420 & n. 4 (9th Cir.1981); *Mason v. Lister*, 562 F.2d 343 (5th Cir.1977). Such enhanced benefit plans do not give employers "the power to forcibly retire older workers," and are not subterfuges to evade the Act. *See Mason*, 562 F.2d at 346. They are "strictly optional with the employees." *See id.*

▮ On the record in this case, the ARP provisions are protected by the ADEA's exemption of bona fide pension plans. The coercion here lay not in the availability of ARP benefits but in the denial of severance pay.

*The Restriction of Death Prior to Retirement Benefits And Retirement Benefits to Employees Actually Eligible at the Time Of Death Or Layoffs*

The EEOC claims that it does not challenge Westinghouse's minimum age and service requirements for receipt of death prior to retirement benefits and regular retirement benefits. Instead, the Commission claims to challenge the manner in which the minimum requirements are applied. In the Commission's view, Westinghouse should continue to confer such benefits on employees who actually meet both criteria at the time of death or retirement, and *also* should confer such benefits on employees who die or are laid with minimum years of service but without the minimum age. The Commission proposes that these employees, or their spouses, should begin to receive such benefits when the employees would have met the minimum age requirements if they had not died or

---

**19.** This is subject to an exception for employees who, for at least two years prior to the retirement, were in executive or high policymaking positions, provided that they receive a minimum level of pension benefits. *See* 29 U.S.C.A. § 631(c)(1).

**20.** The ARP issues received sparse treatment in both the record and the post-trial briefs. I find that plaintiff did not meet its burden of proof on this record.

**370**

been laid off. The Commission contends that any other arrangement is illegal under the ADEA because it would impose an age-based penalty upon employees who involuntarily end their employment with Westinghouse. In short, the Commission attacks the minimum age requirements of the benefit plans, while pretending not to do so.

 While there appears to be no authority directly addressed to this specific contention, this is probably attributable to the fact that such a farfetched argument has never before been raised. The short answer to the EEOC's contention is that the defendant's arrangements are protected by the ADEA's exemption of bona fide pension plans. Every retirement plan contains some age-based distinctions which are necessarily "arbitrary." For example, a retirement plan providing benefits at age 70 would "discriminate" against 65 year old employees. The ADEA exemption for bona fide pension plans permits such legitimate line drawing. See S.Rep. No. 493, 95th Cong., 2d Sess. 9–10, reprinted in 1978 U.S.Code Cong. & Ad.News 504, 512–13; cf. Christensen v. Equitable Life Assurance Society of the United States, 767 F.2d 340, 342 (7th Cir.1985) (absent purposeful discrimination, a negative impact on pension benefits caused by early disassociation from employment is not discriminatory).

### The Disparate Impact Issue: The Impact Number Process

 The EEOC's challenges the impact number process under the disparate impact theory of discrimination. This theory invalidates facially neutral practices that disproportionately affect a protected class unless the employer can justify the practice as a business necessity. See Massarsky v. General Motors Corp., 706 F.2d at 117.

 Proof of discriminatory motive is not necessary in a disparate impact case. See Geller v. Markham, 635 F.2d 1027, 1031 (2d Cir.1980), cert. denied, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981). A prima facie case may instead be established by statistics "from which it may be

inferred that an employer's ... criteria" generate disproportionately adverse results. See id. at 1032. That is, the plaintiff must show that the practice has a "'significantly discriminatory impact.'" See Massarsky, 706 F.2d at 120 (quoting Connecticut v. Teal, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982)). Once a prima facie case has been established, the employer may defend its practice by demonstrating that it is justified by business necessity. Id. The plaintiff may then rebut the defendant's argument by showing that the employer's practice is a mere pretext for discrimination.

The disparate impact theory was developed under Title VII. See Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Westinghouse contends that the EEOC cannot proceed under the theory in the ADEA context. The Third Circuit has not ruled on this question, see Massarsky, 706 F.2d at 120 (declining to decide the issue). Nonetheless, other circuits have applied the disparate impact model to age discrimination cases. See, e.g., EEOC v. Bordens, Inc., 724 F.2d 1390 (9th Cir.1984); Leftwich v. Harris-Stowe State College, 702 F.2d 686 (8th Cir.1983); Geller v. Markham, 635 F.2d 1027 (2d Cir. 1980), cert. denied, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981).

 I am persuaded that disparate impact analysis under the ADEA is appropriate. As I have already noted, Title VII and the ADEA are parallel statutes, see Lorillard v. Pons, 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1977); the disparate impact model should apply in both contexts. See Borden's, 724 F.2d at 1394–95; see also Geller, 635 F.2d at 1032; Equal Employment Opportunity Commission v. Governor Mifflin School District and Governor Mifflin Education Association, 623 F.Supp. 734, 738–41 (E.D.Pa.1985).

Although I find the disparate impact model applicable, I do not find that this case fits the model. The Commission's statistical expert testified that "older workers who were employed at the time an impact

number was announced were less likely to be covered by the impact number than were younger workers." T. Sept. 10 at 140 1. 19–22. Thus, the tendency for older workers to be laid off without an impact number was statistically significant. *Id.* at 148–49. Westinghouse argues that older employees were not disadvantaged by the system because their seniority insulated them from the reduction in force. The Company also argues that the process is based upon a bona fide seniority system and is therefore exempt from the ADEA. *See* 29 U.S.C.A. § 623(f)(2). The EEOC acknowledges the *"de facto* linkage" between the seniority system and the impact number process. In fact, it asserts that this linkage causes the process to have its discriminatory effects. *See* Plaintiff's Post-Trial Memorandum at 57. The Commission's factual analysis is correct, but its legal conclusion is not.

The linkage between the impact number process and the seniority system is what makes the impact number process a legitimate practice under the ADEA. The ADEA expressed a legislative desire to preserve seniority systems by tolerating such side effects. *See* S.Rep. No. 492, 95th Cong., 2d Sess. 9–10, *reprinted in* 1978 U.S.Code Cong. & Ad.News 504, 512–13. The ADEA's exception for seniority systems thus insulates the "last hired, first fired" practice that underlies defendant's impact number process.

The benefits of the impact number program may well be illusory. The EEOC's expert witness testified that

> the individuals who were covered by the impact number generally could not make much use of it because they did not meet the 15 year service requirements whereas individuals who were laid off after the impact number generally could have taken advantage of it in much larger numbers had they been included in the impact number reduction. It had the effect of giving impact numbers to those who couldn't use them and withholding impact numbers from those who could have used them to get ... special benefits.

T. Sept. 10 at 152 1. 6–15. Nonetheless, the plan does not violate the ADEA. Delayed layoffs of older employees, which resulted in the unavailability of impact numbers for them, stemmed from the operation of a bona fide seniority system.

*Willfulness*

An employer's willfulness has two consequences under the ADEA. First, it triggers application of a three year statute of limitations. Second, it triggers availability of liquidated damages.

There has been some disagreement among the courts regarding the appropriate standard of willfulness. There also has been disagreement over whether the same standard should apply in both the statute of limitations and liquidated damages contexts. The Supreme Court recently clarified the standard of willfulness for liquidated damages, but declined to resolve whether the same standard should govern the statute of limitations. *See Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 625 & n. 21, 83 L.Ed.2d 523 (1985).

Under *Thurston,* an employer is liable for liquidated damages if " 'the employer ... knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA.' " *Thurston,* 105 S.Ct. at 624. This standard requires more than a realization that the ADEA might apply. It is therefore more favorable to employers than the "knew that the ADEA was 'in the picture' " standard formerly applied by some courts. *See id.* at 625. On the other hand, it does not require intentional violations. *See id.* at 624 n. 19. An employer will be liable for liquidated damages if it acted in " 'reckless disregard' of the requirement of the ADEA." *Id.* at 626.

The EEOC and Westinghouse agree that *Thurston* governs willfulness with respect to liquidated damages. They disagree, however, on whether *Thurston* also governs willfulness with respect to the statute of limitations. Plaintiff urges that the statute of limitations should be governed

by the "in the picture" standard formulated in *Coleman v. Jiffy June Farms, Inc.,* 458 F.2d 1139 (5th Cir.1971), *cert. denied,* 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972). Defendant advocates uniform application of the *Thurston* standard.

 I find that Westinghouse acted willfully under the *Thurston* standard.[21] There is ample evidence that Westinghouse "acted in 'reckless disregard' of the requirements of the ADEA." *Thurston,* 105 S.Ct. at 626.[22] Defendant has long had the ability and the resources to ascertain the law and to attempt compliance with it. It did not. Trial testimony established that the Westinghouse Human Resources Department employs knowledgeable in-house counsel with extensive experience in the field of employment discrimination. *See* T. Sept. 10, at 4–11. Counsel monitors the legality of Westinghouse policies and practices. *Id.* at 11–16. The Company provides counsel with the resources necessary to keep up with the law. *Id.* at 17–18. These facts alone do not indicate willfulness. Indeed, they might signify eagerness to comply with the law. Nonetheless, the evidence shows that the Company never seriously tried to comply with the ADEA. On the contrary, it ignored increasingly clear signs that its policies were illegal, and stubbornly resisted compliance.

In the face of successive letters of violation, Westinghouse failed to question or change its policies. When litigation ensued, Westinghouse still insisted on the validity of its policies. Westinghouse has every right to do this. On the other hand, its course of action suggests that it did not violate the ADEA by mere mistake. In fact, its denial of severance pay to older employees clearly violated the ADEA. Nonetheless, Westinghouse turned its face from "the handwriting on the wall" by ignoring successive judicial invalidations of plans similar to Westinghouse's. *See EEOC v. Bordens,* 724 F.2d 1390 (9th Cir. 1984); *EEOC v. City of Altoona,* 723 F.2d 4, 7 (3d Cir.1983).

Westinghouse never attempted to modify its arrangements. *See* T. Sept. 10 at 18–20. In 1982, Westinghouse changed its policy and provided an option between LIB and pension benefits. In 1985, a similar change was made for management employees. The Company's motivation, however, was to prolong and ameliorate the predictable unfavorable outcome in litigation over the plans. *See* T. Sept. 10 at 98 1. 3–6 (1982 change); T. Sept. 6 at 142–43 (1985 change).

Finally, the Third Circuit's ruling in the New Jersey case afforded some suggestion that at least the pre-1982 severance pay arrangements violate the ADEA. None-

---

**21.** Since *Thurston,* the courts have not resolved whether the term willful carries more than one meaning in the ADEA. In the Third Circuit alone, the courts are divided. *Compare Equal Employment Opportunity Commission v. Governor Mifflin School District and Governor Mifflin Education Association,* 623 F.Supp. 734, 737–39 (E.D.Pa.1985) (standards are different) *with Slenkamp v. Borough of Brentwood,* 603 F.Supp. 1298 (W.D.Pa.1985) (standards are the same). The problem does not need to be resolved in this case. Because I find willfulness under the standard most favorable to defendant, it follows that Westinghouse is both liable for liquidated damages and subject to the three-year statute of limitations.

**22.** Willfulness is an issue of fact. *See Slenkamp v. Borough of Brentwood,* 603 F.Supp. at 1302; *Marshall v. American Motors Corp.,* 475 F.Supp. 875, 883 (E.D.Mich.1979). The burden of proof of willfulness for the purposes of liquidated damages is on the plaintiff. *See Blackwell v. Sun Electric Corp.,* 696 F.2d 1176, 1184 (6th

Cir.1983); *Kelly v. American Standard, Inc.,* 640 F.2d 974, 979 (9th Cir.1981); 2 H. Eglit, *Age Discrimination* § 18.14 (1985).

There is some confusion with regard to who bears the burden of proof of willfulness for the purposes of the statute of limitations. *See* 2 H. Eglit, *supra,* at § 17.25. Some courts placed the burden upon the defendant by treating willfulness as an affirmative defense. *See, e.g., Marshall v. American Motors Corp.,* 475 F.Supp. at 883–84; *Marshall v. Eastern Airlines, Inc.,* 474 F.Supp. 364, 370 (S.D.Fla.1979). This comports with "[t]he usual view ... that statutes of limitations must be pleaded and proved as affirmative defenses...." *See* 2 H. Eglit, *supra,* at § 17.26. Nonetheless, some courts place the burden upon the plaintiff. *See, e.g., EEOC v. Governor Mifflin School District,* at 738. Because I find that plaintiff has established willfulness in this case, I need not resolve who actually bears the burden of proof.

theless, the company continues to defend those arrangements, primarily through its "no doubledipping" rationale. This rationale simply is not credible. Despite the fact that defendant characterizes it as a long-standing corporate policy, it was first articulated in this litigation. I believe that the articulation is belated because the policy never existed.

▮ Perhaps the most telling evidence of the Company's willfulness is its own argument that it acted in good faith.[23] Westinghouse's good faith argument is two-fold. First, it insists that its post-1982 arrangements were designed in reliance upon statements of EEOC Counsel made in the New Jersey litigation. Second, it argues that its pre-1982 arrangements were designed before enactment of the ADEA. It therefore concludes that it acted in compliance with what appeared to be the law.

▮ I have already discussed and rejected these contentions. They are feeble excuses. Westinghouse has mounted a stubborn, protracted and futile defense of the indefensible policy of denying severance pay to its older employees because they were eligible for pensions. Westinghouse acted in reckless disregard of the requirements of the ADEA in its denial of severance pay benefits to older employees. Westinghouse resisted conciliation and tried to turn plaintiff's conciliatory approaches into a weapon of defense. When it became clear that denying severance pay to those eligible for pensions was going to be found illegal by the Courts, Westinghouse devised a sham option arrangement to evade the ADEA and claimed, without basis, that it was relying on a government lawyer's argument for its own tactical decision. Westinghouse belatedly invented an alleged corporate policy against doubledipping to justify denying older workers their severance pay. The circumstantial evidence is overwhelming that Westinghouse

showed reckless disregard for the matter of whether its pre-July 1982, and post-July, 1982, layoff income benefits and management separation allowance benefits violated the ADEA. I therefore award double damages to the injured employees who fall within the three year statute of limitations.

### ORDER

AND NOW, this 26th day of March, 1986, it is hereby ORDERED that Westinghouse, its employees, agents, successors and assigns are enjoined from denying the LIB and MSA severance pay benefits specified in the annexed Memorandum to employees aged 40 or over, who are otherwise eligible for them, because such employees are also eligible for, or elect to receive, pension or retirement benefits to which they are entitled.

This Court's declaratory judgment as to liability is hereby entered in favor of plaintiff and against defendant on the LIB and MSA issues and in favor of defendant and against plaintiff on the other claims, in accordance with the attached Memorandum, there being no just reason for delay.

U.S. Magistrate Edwin E. Naythons is designated to serve as a Master, pursuant to Title 28 U.S.C. § 636(b)(2) and Rule 53, to make the difficult computation of damages, after receiving such evidence and holding such hearings as are necessary. The Master shall prepare and file a report with his findings of fact and conclusions of law in accordance with Rule 53(e).

This Order is stayed for ten days and pending determination of an appeal.

---

**23.** *Thurston* made clear that good faith is not a defense to willfulness. *See Thurston,* 105 S.Ct. at 625 n. 22. Nonetheless, it also made clear that good faith is relevant to the issue of willfulness. *See id.* at 626. Thus, the Court found that TWA did not act willfully, because "TWA officials acted reasonably and in good faith in attempting to determine whether their plan would violate the ADEA." *Id.*